948 So.2d 655 (2006)
Theodore RODGERS, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC04-1425.
Supreme Court of Florida.
October 26, 2006.
*659 James S. Purdy, Public Defender and James R. Wulchak, Chief, Appellate Division, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
Theodore Rodgers appeals from his judgment of conviction of first-degree murder and sentence of death. We have jurisdiction, see art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm both.

I. FACTS AND PROCEDURAL HISTORY
Based on the testimony presented below, the jury found Theodore Rodgers guilty of the first-degree murder of his wife, Teresa Henderson, and following the penalty phase the court sentenced Rodgers to death.

A. The Guilt Phase
The testimony and evidence presented during the guilt phase of trial established the following. Theodore Rodgers, then *660 sixty years old, was self-employed in Orlando, installing lawn irrigation systems and doing other plumbing work. On the morning of February 14, 2001, he took his stepson to a court appearance and then went to work on a plumbing job at a customer's (the Jacksons) home. After determining that he needed more supplies, Rodgers drove to the daycare business that his wife Teresa operated and where he stored some materials. As he walked down the interior hallway, his wife's ex-husband ran past him, wearing only a pair of pants and carrying his shirt and shoes. Rodgers confronted his wife, saying that he was leaving her. Then he loaded his supplies and returned to his earlier job.
Later, Rodgers drove to Kissimmee, where he met his longtime friend and occasional business partner James Corbett. Together they estimated a job for a potential client. Rodgers acted normally and did not mention the morning's incident to Corbett. Afterwards, Rodgers drove to his mechanic's shop to discuss a problem with his work truck, and then called Verna Fudge, another longtime friend and former girlfriend. He wanted to talk to her about finding a place to stay, but she was working and told him to call later. Rodgers again returned to his customer's home to complete the job. The Jacksons, who had known Rodgers for many years, testified that he did not seem upset and was "just the same Ted [they had] always known."
Rodgers went home and talked to Corbett on the phone about a job. Later, Rodgers called Corbett and said that he was going to kill his wife because he was "tired of her doing what she's doing"; he was "fixing to take care of this problem." Rodgers drove to the daycare. Three young children present there witnessed what happened next. Teresa unlocked the door and admitted Rodgers. They argued and Rodgers slapped and kicked her and knocked her down. Then he walked into a back room of the daycare. Teresa tried to open the front door while talking on the telephone. Rodgers returned with a gun, fired several shots at her, and left.
Meanwhile, Tashunda Lindsey, the victim's daughter, was returning to the daycare after running an errand when she called her mother during the argument. Teresa screamed for help, and as Lindsey approached the daycare, she heard gunshots and saw Rodgers walk to his truck and drive away. She found her mother dying in the doorway of the center.
Rodgers drove to a pool hall, where he encountered two friendsWendy Hammock and Cleveland Reedsitting in a car. Rodgers told them, "I just shot my wife," and asked to borrow Hammock's cell phone. He dialed a number and said, "James [Corbett], man, I did it. I killed Teresa. It's been nice knowing you. Thank you for everything you did. But I got to go." He told Hammock and Reed that he killed Teresa because he caught her with another man. He added that he had to kill himself because he could not go to jail. Walking a short distance away, Rodgers shot himself in the head.
Teresa Henderson suffered abrasions to her face and blunt force injuries to her left arm and back, with the latter injuries consistent with being kicked. Gunshots fired into the back of her head and into her back caused her death. The gunshot wound to her head entered and exited above her left ear and damaged her brain. The other bullet entered her back and traveled downward through her body, penetrating the bronchus and lung, pulmonary artery and superior vena cava, and diaphragm and liver, and lodged in her mid-lower back near the spinal column.
Rodgers testified that he killed his wife accidentally in self-defense. According to *661 appellant, after he finished the job for the Jacksons, he went home and discussed business with Corbett on the phone, but did not threaten to kill his wife. Rodgers then received a call from a woman in Rosemont requesting a job estimate. While he was en route to Rosemont, his wife called twice on his cell phone, but he refused her requests to go to the daycare to talk. On an impulse, however, he decided that he would go but did not tell her.
When he arrived, his wife was lying on a chair, and he saw that the children were in an adjoining room. He and his wife were talking, not arguing, when his wife walked toward him saying, "You all about to run me crazy." She then fired a gun at him. He reached for the gun, and during their struggle over it, the gun fired several times. Realizing Teresa had been shot, Rodgers took the gun and left because he was "scared and upset." He was not injured in the struggle. Rodgers denied telling Corbett, Hammock, or Reed that he killed Teresa, saying that he told them she was shot when they struggled over a gun.

B. The Penalty Phase
During the penalty phase, the State introduced Rodgers's 1963 conviction for robbery and his 1979 conviction for manslaughter, and two witnesses testified to the circumstances of the latter conviction, where Rodgers killed his live-in girlfriend.
Dr. Eric Mings, a psychologist, testified for Rodgers, describing Rodgers's difficult youth and inadequate education as one of eight siblings in a family of poor sharecroppers in rural Alabama during the days of segregation. He also described Rodgers's adult life and opined that Rodgers had an IQ of 69 and was mentally retarded. Several other witnesses testified on Rodgers's behalf, including his daughter, two nieces, two former girlfriends, his older brother, and a childhood friend.
Dr. Greg Prichard, a clinical psychologist, examined Rodgers for the State. Although he acknowledged that Rodgers had received little formal education, Prichard found that Rodgers functioned normally in life. Based largely on the results of adaptive skills tests, Prichard concluded that Rodgers was not mentally retarded.
Pursuant to Rodgers's motion for determination of mental retardation, the trial court held a combined Spencer[1] and mental retardation hearing. Dr. Mings again testified for Rodgers. Two court-appointed, independent experts testified that Rodgers was not mentally retarded.

C. The Sentencing Order and Mental Retardation Determination
The trial court issued a single order addressing mental retardation and sentencing. As to mental retardation, the court concluded that Rodgers is not mentally retarded under section 921.137, Florida Statutes (2003). With regard to sentencing, the order reported that the jury unanimously found the prior violent felony conviction aggravator and recommended death in an eight-to-four vote. The court found the prior violent felony conviction was established and afforded it "extremely great weight." As to mitigation, the court found one statutory mitigator"any other factor in the defendant's background" and nonstatutory mitigation.[2] The court *662 concluded that the single aggravating factor outweighed the mitigating circumstances and sentenced Rodgers to death.

II. THE ISSUES ON APPEAL
Rodgers raises the following seven issues for our review: that the trial court erred (A) by excusing a potential juror for cause; (B) by admitting hearsay testimony during the penalty phase; (C) by admitting Rodgers's old IQ scores from Department of Corrections records; (D) in determining that Rodgers is not mentally retarded; (E) in finding the mitigating circumstances, weighing the aggravating and mitigating circumstances, and determining proportionality; (F) in denying Rogers's motion for disqualification; and (G) in failing to find Florida's death penalty statute unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We address each in turn below and then whether competent, substantial evidence supports the verdict.

A. Excusing a Potential Juror for Cause
Rodgers contends that the trial court erred in dismissing a potential juror for cause, claiming that the juror testified he could impose the death penalty. A trial court has discretion to exclude a juror for cause if the person's opposition to the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)); accord Hertz v. State, 803 So.2d 629, 638 (Fla.2001) (citing Wainwright). On review, we will not reverse absent evidence of manifest error. Hertz, 803 So.2d at 638 (citing Fernandez v. State, 730 So.2d 277, 281 (Fla.1999)).
Having reviewed the record, we find that during voir dire questioning the prospective juror repeatedly stated that if given the choice between recommending life or death, he would always choose life in prison and emphasized that this was his "strong personal belief." Accordingly, the prospective juror evidenced a strong opposition to the death penalty, and appellant has not demonstrated that the trial court's decision to excuse the juror was manifest error.

B. Hearsay in the Penalty Phase
Rodgers next argues that the hearsay testimony of several witnesses admitted during the penalty phase violated his Sixth Amendment right of confrontation under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Crawford held that "[w]here testimonial [hearsay] evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68, 124 S.Ct. 1354. Below, we address (1) whether Rodgers's claim is preserved and whether Crawford applies to this case; (2) whether the testimony admitted violated Crawford; and (3) whether error, if any, was harmless.

1. Preservation and Crawford Applicability
The State erroneously contends that Rodgers's Crawford claim is not preserved and that Crawford does not apply to this case. Before trial, Rodgers filed a motion to bar the State from using any hearsay during the penalty phase that would violate his rights under the Confrontation Clauses of both the state and federal *663 constitutions, and the trial court denied it. At the inception of the penalty phase, Rodgers renewed the motion, and the court again denied it. As testimony began, defense counsel objected to the State's presentation of hearsay testimony through specific witnesses, and each objection was denied.
Section 90.104(1)(b), Florida Statutes, as amended in 2003, provides that "[i]f the court has made a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." See ch. 2003-259, § 1, at 1298, Laws of Fla. This Court adopted the statute "to the extent that it is procedural" "effective on the date it became law," which was July 1, 2003. In re Amendments to the Florida Evidence CodeSection 90.104, 914 So.2d 940, 941 (Fla.2005); see art. V, § 2(a), Fla. Const. (providing "[t]he Supreme Court shall adopt rules for the practice and procedure in all courts"). Rodgers's trial was held after the effective date of the rule. Thus, Rodgers preserved the argument based solely on his pretrial motion. Even if he had not, however, he renewed the motion in the penalty phase and made contemporaneous objections on the same grounds. Accordingly, even absent the rule the claim is preserved.
Further, Crawford applies to this case. In Griffith v. Kentucky, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the United States Supreme Court held that any new rule for conducting criminal trials applies "retroactively to all cases, state or federal, pending on direct review or not yet final." Cf. Chandler v. Crosby, 916 So.2d 728, 729 (Fla.2005) (holding that Crawford does not apply retroactively to final decisions). Rodgers had not been sentenced when Crawford issued in March 2004. In addition, a defendant's rights under the Confrontation Clause apply to the guilt phase, the penalty phase, and sentencing. See Rodriguez v. State, 753 So.2d 29, 43 (Fla.2000) (stating the "uncontroverted proposition that the Sixth Amendment right of confrontation applies to all three phases of the capital trial"). Thus, Rodgers raised and preserved his claim in the penalty phase, and Crawford applies because it issued during the pendency of his case in the trial court.

2. Determining Crawford Error
Rodgers contends that hearsay testimony presented in the penalty phase about his prior manslaughter conviction violated Crawford's holding that, to comply with the Confrontation Clause of the Sixth Amendment, testimonial hearsay statements may be admitted against a criminal defendant only when the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witness. See 541 U.S. at 68, 124 S.Ct. 1354.[3] To establish the prior violent felony aggravator, the State offered evidence surrounding Rodgers's conviction in 1979 for killing his girlfriend. The State presented a former police officer (Bottomley) and a former prosecutor (Woodard) to testify to the statements made and the deposition testimony given by Teresa Caldwell, an eyewitness to the incident.
Bottomley testified that he arrived at the scene to investigate the 1979 incident and took Caldwell's statement at the police *664 station. She told him that she and Rodgers's live-in girlfriend Betty Caldwell (no relation) had been out together. When they returned, Rodgers was upset that Betty was late. The two began arguing and physically fighting. Then Rodgers shot Betty, killing her. On redirect, Bottomley said he was uncertain whether Caldwell said Rodgers hit Betty first, but she had said there was "some slapping or some hitting."
Woodard, the prosecutor in that case, testified based on the defense's 1979 pretrial deposition of Caldwell, at which he was present. Woodard was asked whether Caldwell's pretrial deposition indicated "the initial aggressor" in the argument. After reading part of the deposition, he responded that Caldwell said that Rodgers hit Betty first, and she fell. Betty then cut Rodgers with a razor, and he kicked her, again knocking her down.
Defense counsel timely objected to this hearsay testimony, arguing that it violated Smith's Sixth Amendment right of confrontation. The trial court allowed the testimony, however, because Caldwell testified at the 1979 trial and the State provided the defense with Caldwell's pretrial deposition.[4] The State neither argued nor demonstrated that Caldwell was not available to testify.[5]
Whether the admission of the witnesses' testimony was Crawford error depends on whether Caldwell's statement and deposition are "testimonial." Although in Crawford the Supreme Court declined to define "testimonial," it did say that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68, 124 S.Ct. 1354. Subsequently, however, in Davis v. Washington, ____ U.S. ____, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court addressed how to determine "which police interrogations produce testimony" and held as follows:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id. at 2273-74; see also id. at 2276 (stating that the result of the latter type of interrogation, "whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps the notes) of the interrogating officer, is testimonial"). Under this test, Caldwell's statements to the police officer were testimonial because they were made in the course of an investigation.
Caldwell's 1979 deposition, which Rodgers's defense counsel took in preparing for trial, was even more clearly testimonial. See Davis, 126 S.Ct. at 2275-76 (describing "sworn testimony in prior judicial proceedings or formal depositions *665 under oath" as "involv[ing] testimonial statements of the most formal sort"); Crawford, 541 U.S. at 51, 124 S.Ct. 1354 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").
Thus, both Caldwell's statements to the investigating officer and her deposition testimony are clearly testimonial under Crawford, and the State did not claim or show that Caldwell was unavailable to testify in the penalty phase. Accordingly, Bottomly and Woodard's hearsay testimony violated Rodgers's Sixth Amendment right under Crawford. As we explain below, however, reversal is not required where the error is harmless.

3. Harmless Error
Violations of the Confrontation Clause are subject to harmless error analysis. Hopkins v. State, 632 So.2d 1372, 1377 (Fla.1994). An error is harmless beyond a reasonable doubt when, after considering all the permissible evidence, a court concludes that there is no reasonable possibility that the error contributed to the jury's recommendation of death. See Perry v. State, 801 So.2d 78, 91 (Fla.2001) (citing State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)).
We conclude that the admission of Caldwell's statements through the former investigating officer and assistant state attorney was harmless. First, the State introduced a certified copy of the prior manslaughter conviction, which established the prior violent felony conviction aggravator. See Rodriguez, 753 So.2d at 45 ("[I]n many cases, any error in admitting the hearsay testimony has been considered harmless because the certified copy of the conviction itself conclusively establishes the aggravator.").
The error is also harmless because Caldwell's account of the argument between Betty and Rodgers and his shooting of Betty was merely cumulative to, and corroborative of, Rodgers's own admissions. During the penalty phase, the State also introduced evidence, again through Bottomley, about Rodgers's statements in 1979 to police investigating his girlfriend's killing. These statements were clearly admissible. Rodgers admitted being upset when Betty returned late with the car and that they began arguing. Rodgers stated that Betty attacked him with a razor, and Rodgers "went and got a gun and put it in his pocket." The pair then argued some more, and Betty again attacked him with the razor, this time cutting his hand. Rodgers threw her down and took the razor away from her. Then Betty picked up a "substantial crystal candy dish," and as she charged Rodgers, he shot her.
On cross-examination by the defense, Bottomley testified that in the several years before Rodgers killed Betty, the couple was involved in two documented incidents of domestic violence. On one occasion, Betty had shot Rodgers twice and on another had cut him with a razor. Each time, Rodgers refused to press charges. Bottomley further stated that on the night Rodgers shot Betty, Rodgers was treated at the hospital for the cut Betty inflicted. In addition, he testified that Caldwell told him that she and Betty had been drinking and smoking marijuana before they returned home and that the argument between Rodgers and Betty was "hostile on both sides."
As recounted by the investigating police officer, Rodgers's own more detailed description of his argument with, and killing of, his girlfriend did not conflict with Caldwell's. Except that Rodgers did not specifically say who hit whom first, their descriptions of the order of events are *666 consistent. Because the hearsay testimony was merely cumulative, we hold that its erroneous admission was harmless beyond a reasonable doubt.

C. Admissibility of IQ Test Scores
In the penalty phase, defense counsel sought to exclude old IQ test scores from Rodgers's Department of Corrections records. The defense contended they were inadmissible under Frye v. United States, 293 F. 1013 (D.C.Cir.1923). The trial court denied the motion, concluding that Rodgers's arguments concerned the weight, not the admissibility, of the evidence. Defense counsel then preemptively admitted the scores through the testimony of Dr. Mings.
We note initially that Rodgers preserved his claim despite admitting the evidence himself. See Sheffield v. Superior Ins. Co., 800 So.2d 197, 203 (Fla.2001) ("[O]nce a trial court makes an unequivocal ruling admitting evidence over a movant's motion in limine, the movant's introduction of that evidence does not waive the error for appellate review.").[6] To obtain relief, however, Rodgers must demonstrate that the trial court abused its discretion in denying his motion. See Dessaure v. State, 891 So.2d 455, 466 (Fla.2004) (stating that abuse of discretion standard applies to review of the admissibility of evidence).
The Frye test is used to determine the admissibility of expert scientific opinion by ascertaining whether new or novel scientific principles on which an expert's opinion is based "have gained general acceptance in the particular field in which it belongs." Frye, 293 F. at 1014; see also Castillo v. E.I. Du Pont De Nemours & Co., Inc., 854 So.2d 1264, 1268 (Fla.2003). However, Rodgers objected to admission of the test scores based, for example, on the absence of information about actual testing conditions. He also argued that one of the scores resulted from a "Beta" test, a test Rodgers admits has been used for decades, but which he claimed is used for "screening," not ascertaining an individual's IQ for mental retardation purposes. We agree with the trial court that these objections are matters of weight, not admissibility, and do not implicate Frye. Accordingly, the court did not abuse its discretion in denying Rodgers's motion.

D. The Mental Retardation Determination
Rodgers presents two claims here. First, he argues that section 921.137, Florida Statutes (2003), which governs determinations of mental retardation in death-sentenced defendants, is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). As in our past cases, we find this claim meritless. See Arbelaez v. State, 898 So.2d 25, 43 (Fla.2005) (holding that the defendant "has no right under Ring and Atkins [v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)] to a jury determination of whether he is mentally retarded"); accord Rodriguez v. State, 919 So.2d 1252, 1267 (Fla.2005) (citing Arbelaez and finding "no merit to [Rodriguez's] claim regarding the constitutionality of [section 921.137]").
Second, Rodgers claims that the trial court erred in determining that he is not mentally retarded. Under Florida law, mental retardation means "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." *667 § 921.137(1), Fla. Stat. (2003); see Fla. R.Crim. P. 3.203(b). To demonstrate that a defendant is mentally retarded and not subject to the death penalty, all three prongs must be established.
The court concluded, based on the greater weight of the evidence, that Rodgers is not mentally retarded under Florida law. As to the first prongintellectual functioningthe trial court found that Rodgers fell within the mild mental retardation range. As to the third prong, however, the court found no evidence of onset before age eighteen. Finally, as to the second prongnormal adaptive functioningthe court explained as follows:
It is quite clear from the evidence that the defendant has the capacity to understand and process information, to communicate, to control impulses and to understand the reactions of others. The defendant has possessed personal independence and has functioned in the community as expected of his age and upbringing.
As explained below, we hold that competent, substantial evidence supports these conclusions.
Three doctors testified that Rodgers was not mentally retarded. Dr. Jacquelyn Olander, a court-appointed neuropsychologist, found that Rodgers had an IQ of 75, that his adaptive functioning was average, and that he did not meet the statutory definition of mental retardation. Dr. Teresa Parnell, another court-appointed expert, concluded Rodgers had an IQ of 74, that most of his areas of deficiency related to his lack of education, and that he was not mentally retarded. Finally, Dr. Greg Prichard, a State-appointed expert, testified that Rodgers admittedly had little formal education, but his adaptive functioning was normal, and Rodgers clearly was not mentally retarded. Dr. Mings, the defense's expert, found Rodgers had an IQ of 69 and was the only witness who opined that Rodgers was mentally retarded. The trial court, however, rejected his opinion as not based on the statutory definition.
Appellant contends that the trial court should have found him deficient in adaptive functioning. "Adaptive behavior" is defined by statute as "the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." § 921.137(1), Fla. Stat. (2003). As the trial court found, none of the witnesses, even family and friends of Rodgers, testified that they had ever considered Rodgers to be mentally retarded. Through no fault of his own, his formal education was certainly deficient. The record showed, however, that he held responsible jobs. For example, over a period of years at a Morrison's Cafeteria, he rose from dishwasher to head chef supervising line personnel. He also ran several businesses, including the lawn irrigation business about which Rodgers testified at trial. The latter job required him to bid on projects, determine the necessary supplies and costs, plan and execute the work without direction from others, drive his truck to job sites, and deal with customers. He kept appointments and maintained normal relationships with people, from customers to friends to family members. Dr. Mings's opinion that Rodgers "had significant difficulties living independently" was based solely on the fact that Rodgers had lived with family or girlfriends most of his life. Living with other people, however, does not establish difficulty in independent functioning, and there is no competent, substantial evidence that Rodgers had difficulty functioning independently. For example, Verna Fudge, a longtime friend of Rodgers with whom he lived for almost a year, testified that Rodgers had operated a restaurant and had run *668 a lawn irrigation business, had his hair cut regularly and was concerned with his physical appearance, could cook, and for leisure bet on dogs at the track. She did not testify that he depended on her for anything except friendship.
As explained above, we affirm the trial court's finding that Rodgers is not mentally retarded.

E. Mitigation and Proportionality
Appellant next contends that the trial court erred in failing to find several mitigators and in assigning the weight of mitigators. He also claims that the death sentence is not proportional. We address each claim in turn.

1. Mitigation
Rodgers argues that the trial court erred in failing to find three statutory mitigators about which Dr. Mings testified: (1) Rodgers was under the influence of extreme mental or emotional disturbance; (2) Rodgers's impaired capacity to appreciate the criminality of his conduct; and (3) Rodgers's "mental" age at the time of the crime. On such questions of fact, we affirm a trial court's findings when they are supported by competent, substantial evidence. See Blanco v. State, 706 So.2d 7, 10 (Fla.1997).
As to the first factor, the trial court did not find that Rodgers was suffering an extreme mental or emotional disturbance at the time of the murder. In rejecting the statutory mitigator, the court concluded that the "record [wa]s totally devoid of any evidence of extreme emotional or mental disturbance which would be `more than the emotions of an average man, however inflamed' as required by [State v. Dixon, 283 So.2d 1, 10 (Fla. 1973)]." Rodgers and all the other witnesses testified that after Rodgers confronted his wife in the morning, he put in a full day's work and interacted normally with people who knew him.[7] He also telephoned Verna Fudge, a longtime friend and minister who frequently counseled him on his marital and other problems and with whom he previously had discussed his belief that Teresa was having an affair with her ex-husband. Rodgers told her he was leaving his wife and asked Fudge for help finding a place to stay.[8] Further, Rodgers testified that hours later he went to the daycare to talk to his wife. He said that she surprised him when, without any provocation, she shot at him, and that she was killed in the ensuing struggle. As the trial court noted, Rodgers had ample time for reflection before telling Corbett late in the day that he intended to kill his wife and then going to the daycare to do so. Even the defense's mental health expert testified that Rodgers knew the difference between right and wrong, a fact supported by Rodgers's later decision to commit suicide because he did not want to go back to prison. We conclude that competent, substantial evidence supports the trial court's rejection of this mitigating factor.
The trial court's rejection of Rodgers's claim that his capacity to appreciate the criminality of his conduct was substantially impaired is supported by the same evidence. After a day of behaving reasonably and responding normally in a variety of situations, Rodgers announced his intention to kill his wife in advance of *669 going to the daycare, bragged about it afterward, and attempted to kill himself to avoid going to prison. Further, he testified that although he was upset, he was not angry with his wife, and claimed the killing occurred in self-defense.[9] We find that competent, substantial evidence supports the trial court's rejection of this factor as well.
Finally, in rejecting the claim that Rodgers's "mental" age constituted a mitigating factor, the trial court noted there was no "link" between the defendant's age and the crime, such as immaturity. We agree. The evidence showed that although Rodgers had little formal education, he functioned normally in his relationships with others and in his work, including running his own business. Accordingly, competent, substantial evidence supports the court's decision.
Next, Rodgers claims generally that the court should have afforded more weight to the mitigation found. We review a trial court's assignment of weight to mitigation under an abuse of discretion standard. See Blanco, 706 So.2d at 10 (stating standard of review is abuse of discretion). Thus, we defer to the trial court's determination unless it is unreasonable or arbitrarythat is, unless no reasonable person would have assigned the weight the trial court did. Perez v. State, 919 So.2d 347, 372, 376 (Fla.2005), cert. denied, ____ U.S. ____, 126 S.Ct. 2369, 165 L.Ed.2d 285 (2006); Elledge v. State, 706 So.2d 1340, 1347 (Fla.1997). We hold that Rodgers has not demonstrated that the trial court abused its discretion.

2. Proportionality
Even if Rodgers had not raised the issue, this Court is obligated to review each death sentence to determine whether it is proportional to other cases. See Floyd v. State, 913 So.2d 564, 578 (Fla.2005); Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). "[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003) (citation omitted).
In this case, the trial court found one aggravating factorprior violent felony convictionthat it afforded "extremely great weight." This aggravator was supported by Rodgers's 1963 robbery conviction and his 1979 manslaughter conviction, stemming from killing his girlfriend. The court found a single statutory mitigating factor"any other factor in the defendant's background"and assigned it "very, very, little weight."[10] The trial court also found the following nonstatutory mitigation and ascribed the weight indicated: borderline mental retardation (some weight); abandoned by his father (little weight); "low bonding" to school and no school transportation (very, very little weight); generous and kind to others (very little weight); and had love for and the support of his siblings (very, very little weight). The trial court concluded that none of the mitigation "suggests that the ultimate sanction is disproportionate for someone who has killed two women during his lifetime."
*670 In conducting proportionality review, we have stated that in the absence of demonstrated legal error, we accept the trial court's findings on the aggravating and mitigating circumstances and consider the totality of the circumstances of the case in comparing it to other capital cases. Kearse v. State, 770 So.2d 1119, 1134 (Fla. 2000). Having found the trial court's rejection of mitigating factors to be supported by competent, substantial evidence and that the court did not abuse its discretion in assigning the weight of the aggravating and mitigating factors, we do not, as the dissent does, consider in our analysis those factors the trial court rejected or afford them weight. Accordingly, we emphasize that the trial court expressly rejected these statutory mitigators: extreme mental or emotional disturbance, impaired capacity to conform to the requirements of law, the defendant's "mental" age, and extreme duress. Further, although the trial court did find that Rodgers's intellectual functioning fell in the borderline range, it concluded this fact "did not play a role in the murder" and afforded the factor only "some weight." Thus, as recited above, the mitigation is insubstantial, making this one of the least mitigated cases.
We have stated that generally a death sentence is not proportionate when supported by a single aggravator and the mitigation is substantial. Almeida v. State, 748 So.2d 922, 933 (Fla.1999); Jones v. State, 705 So.2d 1364, 1367 (Fla.1998) (noting that "death is not indicated in a single-aggravator case where there is substantial mitigation"). On the other hand, when the mitigation is not substantial, we have found death sentences to be proportional even when there is but a single aggravator. See Almeida, 748 So.2d at 933 (noting that "this Court has affirmed the death penalty in single-aggravator cases where a prior murder was involved"). Further, in determining proportionality, we evaluate domestic situations in the same manner as other cases. Butler v. State, 842 So.2d 817, 833 (Fla.2003). Thus, "there is no per se `domestic dispute' exception to imposition of the death penalty." Id. (quoting Pooler v. State, 704 So.2d 1375, 1381 (1997)); see Spencer v. State, 691 So.2d 1062, 1065 (Fla.1997). Nor is there a domestic dispute exception for single aggravator cases. In Butler, the defendant, apparently jealous of his former girlfriend's new relationship with another man, sneaked into her apartment as she slept, carried their six-year-old child into another room, and then repeatedly stabbed her mother until she died. The trial court found a single aggravatorthat the murder was heinous, atrocious, or cruel (HAC)and four nonstatutory mitigators. Butler, 842 So.2d at 833. Despite the domestic nature of the murder and the fact that a single aggravator was found, we held the death sentence to be proportionate. Id. at 834. Similarly, in Blackwood v. State, 777 So.2d 399, 412-13 (Fla.2000), we affirmed a death sentence where the defendant murdered his former girlfriend, who was pregnant with her new boyfriend's child. The trial court found one aggravator (HAC), one statutory mitigator (no significant criminal history) and eight nonstatutory mitigators.
In this case, the trial court found a single aggravatorprior violent felony conviction. We have previously stated that this aggravator, like HAC, is one of the "most weighty in Florida's sentencing calculus." Sireci v. Moore, 825 So.2d 882, 887 (Fla.2002). In fact, in determining proportionality in domestic dispute cases, we have ascribed particular importance to this factor when the prior conviction, as in this case, involved a similar violent offense. See Lemon v. State, 456 So.2d 885, 888 (Fla.1984) (affirming a death sentence for the murder of the defendant's girlfriend *671 where the prior conviction was for assault with intent to kill a female victim, and likening the case to others "involv[ing] defendants killing women with whom they had a relationship after a previous conviction for a similar violent offense"); King v. State, 436 So.2d 50 (Fla.1983) (affirming a death sentence for the murder of a live-in girlfriend where the prior conviction was for the axe-slaying of the defendant's common-law wife); Harvard v. State, 414 So.2d 1032 (Fla.1982) (affirming a death sentence for the defendant's murder of his second ex-wife where the prior conviction was for aggravated assault arising from a shooting attack on his first ex-wife and her sister). In this case, Rodgers had two prior violent felony convictionsa robbery and his shooting and killing his girlfriend, the latter being a similar offenseand the trial court assigned the factor extremely great weight.
Under the totality of the circumstances, we further find this case is comparable to Ferrell v. State, 680 So.2d 390 (Fla.1996), and Duncan v. State, 619 So.2d 279 (Fla. 1993). Ferrell shot his live-in girlfriend in the head during a heated argument, and immediately confessed to a neighbor. Ferrell, 680 So.2d at 391. The single aggravatorhis prior second-degree murder conviction for shooting and killing a woman during an argumentoutweighed the following mitigating factors, to which the court gave little weight: "Ferrell was impaired, was disturbed, was under the influence of alcohol, was a good worker, was a good prisoner, and was remorseful." Id. at 391 n. 2. In holding the sentence proportional, we stated that "Ferrell's sentence [was] commensurate to the crime in light of the similar nature of the prior violent offense." Id. The same holds true in this case.
In Duncan, the defendant lived with his fiancée, her daughter, and her mother. One evening he returned to the apartment angry because his fiancée had gone out for the evening with another man. 619 So.2d at 280. The next morning he armed himself in the kitchen, walked outside where she sat, and stabbed her multiple times. When the victim's daughter ran to her aid, Duncan threatened her with the knife, and she fled. Duncan then sat down and waited for the police to arrive, saying that he killed her on purpose. The trial court concluded that the many mitigating factors were outweighed by his prior violent felony convictions for second-degree murder of another prison inmate and aggravated assault on his girlfriend's daughter immediately after the murder.[11] Citing the prior murder conviction, we found the sentence proportional. 619 So.2d at 284.
Rodgers's prior violent felony aggravator was based on his robbery and manslaughter *672 convictions. The latter conviction stemmed from Rodgers's killing of his live-in girlfriend in circumstances similar to the murder of his wife. Although Rodgers did not testify in the penalty phase, through the testimony of the investigating officer, the State presented Rodgers's account to police of the 1979 incident. Thus, by his own admission, Rodgers confronted his girlfriend when she arrived home, and their argument quickly escalated into a physical altercation. Knowing their history of violence, Rodgers retreated from the room when his girlfriend attacked him with a razor blade. Instead of leaving, he armed himself, placing a pistol in his pocket, and then returned and resumed the argument. After she cut him with the razor, he knocked her to the floor and took her weapon. Then she arose and ran toward him with a candy dish. Rodgers shot and killed her before she reached him. Similarly, in the murder of his wife, Rodgers went to the daycare and after ascertaining the children were in an adjoining room, confronted her over her adultery. A physical altercation ensued in which Rodgers hit and kicked his wife. According to the young children who witnessed the incident, he then left the room, returned with a gun, and shot his wife multiple times. Then he left her dying on the floor. See Butler, 842 So.2d at 834 ("Butler was also unfazed by the presence of the victim's children in the apartment at the time. The totality of the circumstances in this case, which includes this indifference combined with the brutality of this murder, supports imposition of the death penalty.").
We acknowledge that in domestic dispute cases involving substantial mental mitigation we have found the death penalty to be disproportionate. See Way v. State, 760 So.2d 903, 921 (Fla.2000) ("[I]n many of the domestic dispute cases where the death penalty was found to be disproportionate, substantial mental mitigation is present."). But this is not such a case. The trial court applied the correct rule of law in making its findings, assigning weight, and weighing the factors,[12] and we have examined the totality of the circumstances and found this case comparable to other cases involving a serious single aggravator outweighing insubstantial mitigation. Accordingly, we hold that Rodgers's death sentence is proportional.

F. Judicial Disqualification
Rodgers contends that the trial judge, Judge Belvin Perry, erred in denying his motion for disqualification filed pursuant to Florida Rule of Judicial Administration 2.160 (now rule 2.330). His motion alleged that on the same day Judge Perry sentenced him, the judge was "a prominent speaker at a Domestic Violence Council Meeting" where he stated that it was time to stop domestic violence by identifying the causes and making sweeping changes. Further, the judge allegedly said he wanted to make Orange County number one in addressing this problem and supporting zero tolerance. Rodgers claimed that, as a result, he had a "legitimate concern regarding Judge Perry's ability to put aside his personal feelings regarding domestic violence and give him a fair and unbiased hearing on both the issues of mental retardation and sentencing." Judge Perry denied the motion as legally insufficient.
The question of whether a disqualification motion is legally sufficient is a question of law that we review de novo. Barnhill v. State, 834 So.2d 836, 843 (Fla. 2002). Rule 2.330(d)(1) requires a motion to disqualify to "show that the party fears *673 that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge." A motion is thus legally insufficient if it fails to demonstrate an objectively reasonable, well-grounded fear of not receiving a fair and impartial trial. Arbelaez v. State, 898 So.2d at 41.
Rodgers's motion did not allege facts sufficient to demonstrate that Judge Perry had a specific or personal bias against him. The judge's alleged desire to solve the problem of domestic violence is not a legally sufficient basis for his disqualification. See Arbelaez v. State, 775 So.2d 909, 916 (Fla.2000) (holding that neither the trial judge's "tough on crime" stance nor her former employment as a prosecutor constituted legally sufficient grounds for disqualification); Tafero v. State, 403 So.2d 355, 361 (Fla.1981) (finding that a trial judge's former employment as highway patrol officer did not constitute legally sufficient grounds for disqualification in first-degree murder trial where victim was a highway patrol officer). Accordingly, we affirm the denial of Rodgers's disqualification motion.[13]

G. Unconstitutionality under Ring

In the trial court, Rodgers argued on various grounds that Florida's death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). On appeal, however, Rodgers acknowledges that we have repeatedly rejected these claims in cases such as this one in which one of the aggravating factors is a prior violent felony conviction. See Duest v. State, 855 So.2d 33, 49 (Fla.2003) (We have previously rejected claims under Apprendi and Ring in cases involving the aggravating factor of a previous conviction of a felony involving violence.), cert. denied, 541 U.S. 993, 124 S.Ct. 2023, 158 L.Ed.2d 500 (2004). We also have rejected Rodgers's related claims that Ring requires aggravators be alleged in the indictment and that the jury recommend death unanimously. Parker v. State, 904 So.2d 370, 383 (Fla.2005) ("This Court has repeatedly held that it is not unconstitutional for a jury to recommend death on a simple majority vote.") (citing Whitfield v. State, 706 So.2d 1 (Fla.1997)); Kormondy v. State, 845 So.2d 41, 54 (Fla.2003) (Ring does not require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury.).
Finally, Rodgers alleges error in the trial court's use of an interrogatory verdict form in which the jurors returned findings as to the aggravator and the mitigators. We have previously stated that we are "unwilling to approve ad hoc innovations to a capital sentencing scheme that both the United States Supreme Court and this Court repeatedly have held constitutional." State v. Steele, 921 So.2d 538, 547 (Fla. 2005). However, we have found use of special verdict forms to constitute harmless error where, as here, no prejudice is alleged. See Huggins v. State, 889 So.2d 743, 772 (Fla.2004) (finding that use of a special verdict form in the penalty phase was harmless error), cert. denied, 545 U.S. 1107, 125 S.Ct. 2546, 162 L.Ed.2d 280 (2005). Accordingly, we deny relief on this issue.

H. Competent, Substantial Evidence
Although Rodgers did not raise this issue, we are obligated to review *674 the record of each death penalty case on direct appeal to determine whether the evidence is sufficient to support the murder conviction. See Fla. R.App. P. 9.142(a)(6); Davis v. State, 859 So.2d 465, 480 (Fla.2003). In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. Bradley v. State, 787 So.2d 732, 738 (Fla.2001); see also McCoy v. State, 853 So.2d 396, 408 (Fla.2003).
We hold that competent, substantial evidence supports the verdict in this case. The evidence showed that after discovering his wife's infidelity early in the day, Rodgers continued to work all day. Later he called James Corbett and told him that he was going to kill Teresa and then drove to the daycare where he confronted her. Children who were present testified that Rodgers argued with Teresa and began hitting and kicking her. Then he left the room and returned with a gun, which he fired at her several times as she tried to escape. He left and drove to a pool hall where he told two friends that he had killed his wife because of her adultery. Then he called his friend James Corbett and told him also. Finally, bruising on the victim was consistent with her being kicked, and of the two gunshot wounds that killed Teresa, one entered from the back of her head and the other entered her back. The latter bullet traveled in a downward trajectory through the victim's body. These injuries and wounds are inconsistent with Rodgers's claims that the gun fired as they struggled over it.

III. CONCLUSION
Based on our review and analysis above, we affirm the judgment and sentence of death in this case.
It is so ordered.
LEWIS, C.J., and WELLS, CANTERO, and BELL, JJ., concur.
CANTERO, J., concurs with an opinion, in which WELLS and BELL, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which PARIENTE and QUINCE, JJ., concur.
QUINCE, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
CANTERO, J., concurring.
I concur in the majority opinion. I write only to comment on our application of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In that case, the United States Supreme Court held that "[w]here testimonial [hearsay] evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68, 124 S.Ct. 1354. Crawford, however, concerned the use of testimonial statements at trial and does not address whether a court may rely on hearsay statements at sentencing. Virtually every federal appellate court has recently addressed the issue and has reaffirmed the longstanding principle that the Confrontation Clause does not apply to sentencing. See, e.g., United States v. Underwood, No. 05-30918, 194 Fed.Appx. 215, 2006 WL 2381926 (5th Cir. Aug. 17, 2006) (reaffirming its prior holding that the Confrontation Clause does not apply to sentencing, and noting that therefore Crawford does not apply to sentencing either); United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir.2006) (same); United States v. Statts, No. 05-4896, 189 Fed.Appx. 237, 2006 WL 1918956 (4th Cir. July 12, 2006) (same); United States v. Littlesun, 444 F.3d 1196, *675 1199-1200 (9th Cir.2006) (same), cert. denied, ___ U.S. ___, 127 S.Ct. 248, 166 L.Ed.2d 149 (U.S. 2006); United States v. Katzopoulos, 437 F.3d 569, 576 (6th Cir. 2006) (same); United States v. Cantellano, 430 F.3d 1142, 1146 (11th Cir.2005) (same), cert. denied, ___ U.S. ___, 126 S.Ct. 1604, 164 L.Ed.2d 325 (2006); United States v. Roche, 415 F.3d 614, 618 (7th Cir.) (same), cert. denied, ___ U.S. ___, 126 S.Ct. 671, 163 L.Ed.2d 541 (2005); United States v. Luciano, 414 F.3d 174, 179 (1st Cir.2005) (same); United States v. Fleck, 413 F.3d 883, 894 (8th Cir.2005) (reaffirming prior holding that the Confrontation Clause does not apply at sentencing); United States v. Martinez, 413 F.3d 239, 243-44 (2d Cir. 2005) (reaffirming its prior holding that the Confrontation Clause does not apply to sentencing and noting that therefore Crawford does not apply to sentencing either), cert. denied, ___ U.S. ___, 126 S.Ct. 1086, 163 L.Ed.2d 902 (2006).
Some courts have created exceptions in the peculiar context of capital cases. In Cantellano, for example, the Eleventh Circuit noted that it has "recognized a right to cross-examination in the context of capital sentencing." 430 F.3d at 1146 (citing Proffitt v. Wainwright, 685 F.2d 1227, 1254-55 (11th Cir.1982)). We, too, have held that a defendant's rights under the Confrontation Clause apply to the guilt phase, the penalty phase, and sentencing. See Rodriguez v. State, 753 So.2d 29, 43 (Fla.2000) (stating the "uncontroverted proposition that the Sixth Amendment right of confrontation applies to all three phases of the capital trial"); see also Holland v. State, 773 So.2d 1065, 1074 (Fla. 2000) (applying the right of confrontation to a capital sentencing proceeding); Way v. State, 760 So.2d 903, 917 (Fla.2000) (same); Thompson v. State, 619 So.2d 261, 265 (Fla.1993) (same). Although these cases were decided years before Crawford and the cases interpreting it, I do not suggest we recede from them. I do suggest, however, that their holdings are limited to the unique context of capital sentencing. This Court has never applied the Confrontation Clause to noncapital sentencing proceedings.
WELLS and BELL, JJ., concur.
ANSTEAD, J., concurring in part and dissenting in part.
I concur in the Court's affirmance of Rodgers' conviction. I dissent to the majority's approval of the sentence of death and the finding of the harmlessness of the unlawful admission of evidence of the circumstances of the sole aggravator relied upon by the trial court to justify imposition of a sentence of death.

Crawford Issue
As the majority acknowledges, the hearsay statements by Teresa Caldwell related by the police investigator and prosecutor on the homicide of Betty Caldwell violated Rodgers' Sixth Amendment right to confront adverse witnesses as interpreted in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and more recently Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
While I agree with the majority that the evidence of the circumstances of the prior violent crime aggravator was improperly admitted in violation of appellant's constitutional rights, I cannot agree that the error was harmless. To find it harmless we would have to conclude that the State has proven that neither the judge nor jury could have possibly relied upon this evidence in determining appellant's sentence. See State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). In this case such a finding would be literally impossible since the only aggravator relied upon to justify the death sentence was the prior violent felony. *676 Both the jury and the judge had to place substantial weight on this aggravator in order to recommend and impose a sentence of death. How can you have a stronger showing of prejudice than that the illegally admitted evidence resulted in a death sentence?
Since the trial judge is the one who rejected the defendant's claim that this evidence should not be considered by the jury, we can say with some certainty that the evidence was clearly intended to be considered by the jury in determining the weight to be given to the prior violent felony. Further, in the case of the trial judge, we know that he placed very great weight on this aggravator since he said so in his sentencing order. It naturally follows then that the admission of this evidence could not have been harmless under DiGuilio since our harmless error test requires the State to demonstrate beyond a reasonable doubt that there is no reasonable possibility that this evidence influenced the fact-finder.
The majority concludes that the error is harmless because Rodgers' own version of events related to the investigator were cumulative to, and corroborative of, the hearsay version. However, the State elicited testimony that in a deposition Teresa Caldwell testified that Rodgers was the initial aggressor in that he knocked Betty Caldwell to the ground before she confronted him with a razor. Rodgers' own statement, related by the police investigator during the penalty phase, did not reflect whether he or Betty was the initial aggressor. The State also elicited testimony from the Caldwell homicide prosecutor suggesting that the jury rejected the defense theory of self-defense, which buttressed the hearsay identifying Rodgers as the initial aggressor.[14] Because this testimony went to the sole aggravator in the case, previous conviction of a violent felony, I cannot conclude beyond a reasonable doubt that the hearsay reflecting that Rodgers struck the first blow in the fatal confrontation with Betty Caldwell did not contribute to the eight-to-four death recommendation or the trial court's assignment of extremely great weight to that aggravator in imposing death.
Finally, to say that the defendant was able to rebut harmful and improperly admitted evidence by having his own prior version of the crime admitted is a non sequitur. Perhaps a finding that the aggravator was given little weight because the defendant's version of the facts was accepted would make the error harmless, but, of course, we know that did not happen. Rather, we know that the opposite happened, and this prior crime was given such great weight that it was relied upon to impose a sentence of death. In fact, the harmfulness of the error continues on appeal when the majority deviates from our prior case law establishing that ordinarily a death sentence will not be approved in a single aggravator case, by joining with the trial court in relying on the weight of this single aggravator to sustain a sentence of death.

Proportionality
Case law from this Court has consistently and explicitly held that the law of Florida reserves the death penalty for "only the most aggravated and least mitigated" of first-degree murders. State v. Dixon, 283 So.2d 1, 7-8 (Fla.1973) (finding a "legislative *677 intent to extract the penalty of death for only the most aggravated, the most indefensible of crimes"); see also Urbin v. State, 714 So.2d 411, 416 (Fla.1998); Cooper v. State, 739 So.2d 82, 85 (Fla.1999); Almeida v. State, 748 So.2d 922, 933 (Fla. 1999). "Thus, our inquiry when conducting proportionality review is two-pronged: We compare the case under review to others to determine if the crime falls within the category of both (1) the most aggravated and (2) the least mitigated of murders." Cooper, 739 So.2d at 85 (quoting Almeida, 748 So.2d at 933). By applying a proper analysis under these principles, it becomes apparent that this is clearly not the most aggravated nor the least mitigated case for which we reserve the ultimate sanction of death. In fact, this Court has found the death penalty disproportionate in most single aggravator cases, and particularly in cases involving emotional and violent domestic encounters, many of which involved circumstances much more aggravated and less mitigated than here.
It is undisputed that the killing arose out of a domestic dispute that escalated into tragedy with the death of Rodgers' wife and his own attempted suicide. His actions after accidentally finding his wife and her lover in compromising circumstances can only be described as bizarre. Rodgers, who was attempting to salvage his broken marriage, became suspicious of his wife's ex-husband, with the circumstances escalating on the day of the killings when Rodgers discovered his almost fully naked wife and a half-naked ex-husband running out of his wife's day care as Rodgers showed up there unexpectedly. Rodgers had apparently attempted to end the troubled relationship marked by his wife's infidelities, but with his mental deficits and handicap he simply could not cope with living alone or living apart from an unfaithful wife for whom he still cared. Finally, when he returned to the day care later in the evening, he had become distraught, unable to reason and cope with the humiliating situation he faced. The outcome was tragic; a life taken and the defendant's life forfeited by either death or life in prison without parole. This was clearly a crime of heated passion arising from violent emotions brought on by jealousy and limited mental resources for coping.

Single Aggravator
In numerous cases, this Court has found the sentence of death disproportionate in cases involving only one aggravator. While there will always be room for exceptions, we have followed a general rule that death is not proportionate in single aggravator cases absent unusual circumstances. See Jones v. State, 705 So.2d 1364, 1366 (Fla.1998); see also Almeida, 748 So.2d at 933-34 (holding that death sentence was disproportionate where, after striking aggravator, defendant was left with a single aggravator and substantial mitigation including "a brutal childhood and vast mental health mitigation"); Jorgenson v. State, 714 So.2d 423, 425, 428 (Fla.1998) (finding death disproportionate where the sole aggravator consisted of a prior conviction for second-degree murder many years before, and where the mitigation consisted of two statutory and three nonstatutory circumstances); Besaraba v. State, 656 So.2d 441, 446-47 (Fla.1995) (finding the death sentence disproportionate where defendant's sole aggravator was a prior violent felony and defendant had "vast" mitigation including two statutory and several nonstatutory factors); Nibert v. State, 574 So.2d 1059, 1061-63 (Fla.1990) (vacating death sentence as disproportionate where there was one aggravator and a "large quantum of uncontroverted mitigation").
Comparing these cases with the instant one reveals clearly that this case is not the *678 most aggravated or least mitigated of crimes, for which the death penalty is reserved. This Court should vacate the death sentence in light of the single aggravating circumstance, mitigated in weight, as in Jorgenson, due to the circumstances of that prior crime, the passage of over twenty years since the prior crime, and the substantial mitigating circumstances that surround this crime and affect the defendant.

Emotional Circumstances
A sampling of cases where the Court has reduced death sentences in emotional domestic violence cases also reflects many that were even more aggravated or less mitigated than Rodgers' case. In Farinas v. State, 569 So.2d 425, 427 (Fla.1990), for example, the defendant was intensely jealous and obsessed with the idea of having the victim, his former girlfriend, return to live with him. Farinas forced his ex-girlfriend's car off the road and confronted her about reporting to the police that he was harassing her. He then kidnapped her. When the victim jumped out of the car and attempted to escape, Farinas fired a shot that hit the victim in the back causing instant paralysis from the waist down. He then approached the victim as she lay face down. After unjamming his gun, he fired two shots into the back of her head. Despite the fact that two valid aggravating factors existed, this Court concluded that the death sentence was not proportionately warranted because of the domestic, emotional circumstances of the crime. Farinas, 569 So.2d at 431-32.
In White v. State, 616 So.2d 21, 22 (Fla. 1993), White and the victim had dated for some time before the relationship ended badly. Months later, White assaulted the victim's date with a crowbar, and while in jail for that incident, White swore that he would kill his former girlfriend. When he was released, White obtained a shotgun and drove to the victim's place of employment where he encountered the victim in the parking lot. When she screamed and turned to run, White shot her and after she fell down, he approached and fired a second shot into her back. After proclaiming, "I told you so," White drove away. Upon review of a sentence of death, and considering the emotional circumstances, this Court concluded that the death sentence was disproportionate. White, 616 So.2d at 25; see also Douglas v. State, 575 So.2d 165, 167 (Fla.1991) (death sentence disproportionate where the defendant, who had been involved in a relationship with the victim's wife, abducted the victim and his wife, tortured them over a four-hour period by forcing them to perform sexual acts at gunpoint, hit the victim so forcefully in the head with the rifle that the stock shattered, and then shot him in the head); Ross v. State, 474 So.2d 1170, 1174 (Fla. 1985) (death penalty disproportionate for bludgeoning murder of wife; even with most serious aggravator of HAC); Halliwell v. State, 323 So.2d 557, 561-62 (Fla. 1975) (death sentence disproportionate where the defendant, who was in love with the victim's wife, became violently enraged at the victim's treatment of her, and beat him to death with a breaker bar).

Mental Mitigation
This is a case where the mental deficits of the defendant are not disputed, even if his technical classification as mentally retarded may be.[15] The mitigation presented *679 here included borderline range of intellectual functioning or mental retardation or both, his loving relationships with his family, his abandonment by his father, his participation in religious worship, and his growing up in poverty in a racist Alabama. When this mitigation is considered with the single aggravator of a crime, as in Jorgenson, committed more than twenty years previously under circumstances where a jury reduced a charge of second-degree murder to manslaughter, all support a conclusion that this case is not among the most aggravated and least mitigated.
We have consistently recognized mental mitigation as among the most compelling. See Besaraba, 656 So.2d at 445-46 (defendant experiencing a psychotic episode in which he was unaware of his actions, evidence of past emotional disturbances, and situational stress of confrontation with victim which triggered episode, all establish this mitigator and justified a life sentence); Morgan v. State, 639 So.2d 6, 14 (Fla.1994) (reducing death sentence to life, despite finding by trial court that rage and mental infirmity did not play a major role in the crime); Knowles v. State, 632 So.2d 62, 67 (Fla.1993) (organic brain damage, psychotic state, neurological deficiencies, coupled with intoxication caused this Court to reverse trial court's rejection of this factor and to reduce to life); Carter v. State, 560 So.2d 1166, 1168-69 (Fla.1990) (organic brain damage, increased impulsiveness, diminished ability to plan events, psychologist testified that defendant "probably" unable to appreciate criminality led this Court to reduce the death penalty sentence to life in prison). In Cooper v. State, 739 So.2d 82, 84 (Fla.1999), the trial court found that two statutory and several nonstatutory mitigators were established. The trial court did not find brain damage to be mitigating but did find the defendant's low intelligence to be mitigating. This Court vacated the death sentence, holding that the defendant's mental mitigation and other factors caused the case to be one of the more, rather than least, mitigated of crimes. Cooper, 739 So.2d at 86; see also Brown v. State, 526 So.2d 903, 908 (Fla.1988) (vacating a death sentence and remanding for imposition of a life sentence where the mitigating evidence included circumstances that the defendant had an IQ of 70-75, which was "classified as borderline defective or just above the level for mild mental retardation," and emotionally handicapped).
Rodgers was diagnosed by all experts as functioning in the borderline range of intelligence (at most in the fifth percentile, although possibly in the second percentile, the retarded range). One expert, Dr. Mings, explained that even if not mentally retarded, Rodgers' mental disabilities and low functioning were causally related to the crime, and the defendant committed the crime while under the influence of extreme mental or emotional disturbance. Dr. Mings' testimony also indicated that the defendant suffered from a developmental, intellectual age and reasoning level of a nine-or ten-year-old, which affected his crime here. Of course, persons of young age (under the age of eighteen), have been held to be ineligible for the death penalty due to their immaturity and underdeveloped sense of responsibility and because the character of a juvenile is not as well formed as that of an adult, their personality traits being more transitory, less fixed. See Roper v. Simmons, 543 U.S. 551, 569-70, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). While Roper provides no immunity to the defendant, persons with learning and personality disabilities which give them an emotional or developmental age below eighteen suffer from many of the same defects which mitigate against the death penalty. See Downs v. State, 574 So.2d *680 1095, 1099 (Fla.1991) (wherein this Court vacated a death sentence and remanded for imposition of a life sentence based upon "ample mitigating evidence," including defendant's IQ of 71, a mental age of thirteen, and borderline mental retardation).
Finally, this case is clearly distinguishable from those cited by the majority to show that the similarity of the prior and current homicides weighs in favor of a sentence of death. In Ferrell v. State, 680 So.2d 390 (Fla.1996), the prior homicide was a second-degree murder in which the defendant walked up to the victim sitting in her car and shot her eight times with a .22-caliber rifle. Finding that the killing bore "many earmarks" to the subsequent capital murder, this Court concluded that the death sentence was "commensurate to the crime in light of the similar nature of the prior violent offense." Id. at 391. In addition, the death recommendation was ten to two. In Duncan v. State, 619 So.2d 279 (Fla.1993), the prior killing was a second-degree murder of a fellow inmate. The jury unanimously recommended death. Id. at 281.
Rodgers' previous manslaughter conviction, and the circumstances in which it occurred, distinguish this case from the prior second-degree murders relied upon for proportionality purposes in Ferrell and Duncan. The 1978 killing was the culmination of a mutually violent relationship. The killing itself followed violent behavior by the victim. There is no evidence in this case of violent behavior by the victim, either before or during the fatal confrontation. The spark for the 1978 manslaughter was evidently the victim's tardiness; here, it was discovery of what appeared to be the victim's adultery. Further, unlike the ten-to-two vote for death in Ferrell and the unanimous vote in Duncan, the death recommendation in this case was two votes from a tie, which would have precluded a death sentence.
PARIENTE and QUINCE, JJ., concur.
QUINCE, J., concurring in part and dissenting in part.
I concur in the majority's decision to affirm Rodgers' conviction for first-degree murder. However, I agree with that portion of Justice Anstead's separate opinion that dissents from the majority's affirmance of the sentence of death because of improperly admitted evidence concerning the sole aggravator of prior violent crime. The majority acknowledges that the testimony of a police officer and the former prosecutor about the statements made and the deposition of the eyewitness to the prior crime were error under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). I cannot agree with the majority that this error was harmless.
This is a single aggravator case. The defense presented mitigating testimony, including testimony that Rodgers was at least borderline mentally retarded. The jury vote was eight to four. Under these circumstances, I cannot say that the circumstances of the prior crime as related through the hearsay testimony of the police officer and the former prosecutor was harmless beyond a reasonable doubt.
PARIENTE, J., concurs.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993) (requiring additional evidentiary hearing be held after the jury makes a sentence recommendation, to afford the defendant, defense counsel, and the State an opportunity to be heard and present additional evidence).
[2] "Using the defendant's terminology," the trial court found the following nonstatutory mitigation: (1) that if not legally mentally retarded, Rodgers was at best borderline (some weight); (2) that Rodgers was abandoned by his father (little weight); (3) that Rodgers had low bonding to school and no school transportation (very, very little weight); (4) that Rodgers was generous and kind to others (very little weight); and (5) that Rodgers had the love and support of and for his siblings (very, very little weight).
[3] In his brief, Rodgers also contended that some of Dr. Prichard's testimony for the State during the penalty phase also violated Crawford, but at oral argument he waived this contention. When questioned, he repeatedly stated that the witnesses were available and instead argued, based on alleged conflicts in the evidence, that competent, substantial evidence did not support some of the expert's findings.
[4] The State represented that no trial transcript was available.
[5] We note that before Crawfordand when this penalty phase was heldwe considered such hearsay testimony the less prejudicial method of presenting evidence of prior convictions because it was "generally beneficial to the defendant for the jury to hear about those details from a neutral law enforcement official rather than from prior witnesses or victims." Rodriguez v. State, 753 So.2d 29, 44 (Fla.2000).
[6] The prosecutor, however, told the court that the State did not intend independently to introduce the scores, but might use them in cross-examination.
[7] Rodgers's success in maintaining normality after his discovery and his effort to seek help with his problems do not seem "bizarre." See concurring in part and dissenting in part op. at ____ (stating that Rodgers's actions that day "can only be described as bizarre").
[8] Rodgers testified that he could have gone to stay with family members in town, but he "wanted to make [his] own choice" about what to do.
[9] As the trial court stated, "[I]t defies logic that a defendant who claimed self defense as a defense for his actions can now say that his capacity to conform his conduct to the requirements of the law was substantially impaired."
[10] This factor was based on Rodgers's impoverished background. He was raised in a shack without utilities, worked in the fields as a child, and had little opportunity for schooling in segregated Alabama in the 1940s and 1950s.
[11] The trial court found fifteen mitigators, but we held that three were unsupported by competent, substantial evidence. Duncan, 619 So.2d at 283. The remaining factors were (1) he was emotionally handicapped by his childhood, (2) the murder was not for financial gain, (3) the murder did not create great risk of death to others, (4) the murder was not committed during commission of another felony, (5) the victim was not a stranger, (6) the victim was not a child, (7) Duncan was a good, reliable employee, (8) Duncan was a good listener and supportive friend, (9) Duncan satisfactorily completed parole, (10) Duncan confessed, (11) the murder resulted from a domestic dispute, and (12) the victim chose to marry Duncan. Id. at 281. Subsequently, in State v. Duncan, 894 So.2d 817 (Fla.2004), cert. denied, ___ U.S. ___, 126 S.Ct. 397, 163 L.Ed.2d 275 (2005), we affirmed the trial court's grant of a new penalty phase on Duncan's motion for postconviction relief because during the penalty phase, defense counsel failed to present "available, substantial evidence" to support two statutory mental health mitigators: extreme mental or emotional disturbance and substantially impaired capacity to appreciate conduct's criminality or conform conduct to requirements of law. Id. at 825.
[12] The trial court found that none of the mitigation "suggests that the ultimate sanction is disproportionate for someone who has killed two women during his lifetime."
[13] We note further that the motion was untimely filed under rule 2.330(e), which requires filing within ten days after discovery of the facts on which the motion is based. In this case, the meeting and sentencing occurred on June 16, 2004, and the newspaper reports appeared the following day, but appellant did not file his motion until July 1.
[14] Rather than an outright rejection of self-defense, the verdict of guilty of manslaughter in Rodgers' 1979 trial may have reflected a finding of "imperfect self-defense," i.e., meeting nondeadly force with deadly force. See Roberts v. State, 425 So.2d 70, 71 (Fla. 2d DCA 1982) ("The crime of manslaughter encompasses those situations in which the defendant uses excessive force to defend himself.").
[15] While the issue is obviously close, I cannot disagree with my colleagues in the majority on the finding of mental retardation since there is some evidence to support the trial court's finding as to one element of mental retardation. Nevertheless, all of the evidence presented below, including that of the experts, indicates that the defendant has serious, and permanent, problems with mental functioning.