971 So.2d 196 (2007)
Henry L. BENNETT, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 1D06-4441.
District Court of Appeal of Florida, First District.
December 31, 2007.
*197 Nancy A. Daniels, Public Defender, and Joel Arnold, Assistant Public Defender, Tallahassee, for Appellant.
*198 Bill McCollum, Attorney General, Carolyn J. Mosley, Assistant Attorney General, Tallahassee, for Appellee.
THOMAS, J.
Appellant appeals his convictions for attempted sexual battery, sexual battery, and lewd and lascivious molestation, asserting that the trial court reversibly erred in finding the child victim, N.D.D., competent to testify and that it erred in imposing sentence based on double jeopardy violations and improper assessment of victim injury points. We affirm the trial court's rulings in all respects.
We begin by summarizing the relevant facts, emphasizing the competency proceedings conducted here which included an examination of N.D.D., the defense expert's testimony regarding her competency, and the trial court's ruling finding her competent to testify. We also review the relevant trial testimony and the State's closing argument. We first address Appellant's argument challenging the trial court's ruling on competency and then his two arguments challenging his sentence.

Facts
Appellant was charged with one count of sexual battery by vaginal penetration or union with Appellant's penis between June 1, 2004 and June 18, 2005; one count of sexual battery by digital penetration; and two counts of lewd and lascivious molestation based on unlawful and intentional touching of N.D.D.'s breasts, genitals, or buttocks.

Competency Examination of N.D.D.
On the morning of trial, the court conducted a competency examination to determine N.D.D.'s competence to testify. N.D.D. testified that she was 12 years old and identified the middle school she attended, her favorite subject and her favorite books. She testified about what she did yesterday and told the court what she received as gifts last Christmas. She said she knew the importance of telling the truth; that telling the truth is "good" while telling a lie is "bad." She correctly answered a question regarding color and promised to "tell only what really happened."
The trial court correctly concluded that it needed to determine whether N.D.D. understood her duty to tell the truth. Appellant's counsel attempted to ask N.D.D. several questions regarding the importance of telling the truth in court and what "might happen" if she lied in court versus lying somewhere else, such as at home. N.D.D. seemed confused by counsel's questions, so the court attempted to simplify them, asking, "What happens if you tell a lie, in general?" N.D.D. said, "I don't know. You tell the truth." Additionally, N.D.D. could not answer counsel's question regarding what would happen if she told her mother a lie and her mother found out.
The court later asked N.D.D., "Would [you] ever tell your teacher a lie?" N.D.D. answered no and promised the court she would tell the truth. The court inquired about whether N.D.D. knew why she was in court; after replying no, the court asked, "Did some things happen to you that these ladies want to ask you about some things that happened to you a while back?" When N.D.D. answered yes, the court asked if she was going to tell the truth or a lie when she testified; N.D.D. answered, "Truth."
The court further inquired whether anyone told her to "say something that was a lie?" She answered, "No." The court asked, "If you tell us what happened, do you understand that you need to tell us nothing but the truth?" She answered, "Yes."
*199 Appellant's counsel asked N.D.D. if anyone told her what to say, and she replied that she was told, "Tell the truth." When asked if anyone told her "not to say something happened when it really happened," she answered, "No."
The court asked N.D.D. if "anyone [told] her to say something that was not true? Did anyone tell you to say something that was a lie?" She answered no, but also answered "good" when asked if "someone told you [to say something that was not true], would that be a good thing or a bad thing?"
Dr. James Larson, an expert witness who reviewed N.D.D.'s pretrial deposition and watched her in court, testified that N.D.D. does not have a mental age of 12 years. In his opinion, she has "significant expressive and receptive language impairments" and some of her answers were irrelevant, incorrect, or not responsive. Dr. Larson noted that she could not describe the difference between telling the truth in court or at home and gave inconsistent answers regarding the number of sex acts Appellant allegedly committed. In noting that N.D.D. answered yes when the court asked, "Do you mind if I ask you some questions," Dr. Larson concluded that she felt pressure to cooperate and obtain approval.
Dr. Larson admitted that he had heard adults incorrectly answer a "do you mind" question. He also acknowledged that N.D.D. may have thought the question regarding the number of sex acts referred to the number of acts on a particular day, not the total number of acts. Dr. Larson noted that many child witnesses have deficiencies, recognizing that N.D.D. did better in court than during her deposition, and agreed that a person could be mentally impaired or deficient and still be competent to testify.
The trial court ruled N.D.D. was competent to testify, finding that she understood her responsibility to tell the truth; the difference between a truth and a lie; why she was testifying; and that she had the ability to recollect and understand facts about which she would testify. The court noted that it was satisfied that N.D.D. could communicate and respond to properly framed questions and that many of Appellant's arguments related to the weight and credibility her testimony should receive, rather than to its admissibility.

Trial Testimony
At trial, a family friend testified that she picked up N.D.D. from Appellant's home on June 17, 2005, to go to church. N.D.D. looked shocked to see her, was wearing revealing clothes, her hair was scattered, and she had a white substance around her mouth. When they arrived at church, N.D.D.'s cousin told the friend to take N.D.D. home. The cousin later took her to the hospital for an examination and overheard N.D.D. say Appellant touched her and "put his thing in her," and she did not like it.
Appellant's cousin, N.D.D.'s current guardian, testified that N.D.D. has a learning disability and speaks slower than average.
N.D.D. testified that she was born May 23, 1994, and lives with her cousin. She testified that she went to Appellant's home after school and that while on his bed, Appellant frequently rubbed her vagina and breasts with his fingers, kissed her breasts, and touched her vagina with his penis. She testified that Appellant told her he would make a woman out of her, but not to tell anyone.
The Child Protection Team case coordinator testified that N.D.D. said Appellant touched her breasts and vaginal areas with his hand and penis.
*200 Patrick Murray, M.D., a pediatrician, examined N.D.D., finding secretions on her pubic hair, but no evidence of injury or tissue trauma. N.D.D. did not report any sexual penetration to him, but Dr. Murray testified that she might not be able to describe the difference between "on" and "in" due to her mild developmental delays.
Detective Brian Jones testified that he went to the hospital on June 18, 2005, to investigate N.D.D's allegations. He later interviewed Appellant at the police station where Appellant voluntarily gave a statement.
A second audiotaped interview conducted on June 22, 2006, was played for the jury. During this interview, Appellant said N.D.D. persuaded him to touch her vagina. Appellant denied digitally penetrating her on June 17, but admitted that he had done this once or twice before and admitted touching her vagina four times over the previous year. He regretted it happened and admitted he knew better.
At trial, Appellant testified that N.D.D. visited him on June 17, 2005. Her hair was unkempt when she arrived. She ate a piece of cake and asked Appellant to touch her, but he would not, saying she was too young. Appellant denied telling N.D.D. that he wanted "to make a woman out of her," stating that he told her he wanted to "make a lady out of her."
Appellant testified that he thought that by admitting to touching N.D.D.'s genitals during the audiotaped interview he was admitting to simple battery and would therefore be able to bond himself out that day. He denied ever touching N.D.D.'s breasts or having sexual intercourse with her. He testified that he suffered from sexual dysfunction, which his physician confirmed at trial.

State's Closing Argument, Jury Verdict and Sentence
In its closing argument, the State argued that sexual battery, as charged in Count I, could be proven with evidence showing any contact or union between Appellant's penis and N.D.D's vagina, and that penetration was not required. The State acknowledged that sexual battery by digital penetration, as charged in Count II, must be proven by penetration.
The jury found Appellant guilty of the lesser-included offense of attempted sexual battery in Count I; guilty of sexual battery, as charged in Count II; and guilty of lewd and lascivious molestation, as charged in Counts III and IV. The trial court sentenced Appellant to 225 months' imprisonment on Count I; life imprisonment on Count II; and five years' imprisonment on Counts III and IV.
Appellant filed a motion pursuant to rule 3.800(b)(2), Florida Rules of Criminal Procedure, arguing that his dual convictions and sentences for Counts II and III violate double jeopardy, as they were based on the same act. Appellant also argued that his conviction on Count IV was based on the same episode as his conviction on Count I, thus it violates double jeopardy. Appellant further argued that he should be resentenced on Count I, as the trial court improperly assessed victim injury points for sexual contact when the jury made no specific findings of sexual contact, and a conviction for attempted sexual battery does not necessarily require sexual contact. The trial court denied Appellant's motion.

Analysis

I. Competency to Testify
We review the trial court's ruling finding N.D.D. competent to testify under an abuse of discretion standard. Griffin v. *201 State, 526 So.2d 752, 753 (Fla. 1st DCA 1988).
The competence of a child witness is based on intelligence, not age, and whether the child possesses a sense of the obligation to tell the truth. Lloyd v. State, 524 So.2d 396, 400 (Fla.1988). When ruling on a child's competency to testify, "the trial court should consider (1) whether the child is capable of observing and recollecting facts, (2) whether the child is capable of narrating those facts to the court or to a jury, and (3) whether the child has a moral sense of the obligation to tell the truth." Griffin, 526 So.2d at 753 (citations omitted). Factors to consider in reviewing the trial court's decision on a child's competency to testify include the entire context of her testimony and whether her testimony is corroborated by other evidence. See Lloyd, 524 So.2d at 400 (noting that most of the critical facts supplied by the child's testimony were either unrefuted or corroborated by other witnesses).
Appellant argues, citing Black v. State, 864 So.2d 464 (Fla. 1st DCA 2003), that the trial court erred by finding N.D.D. competent to testify because the trial court's cursory questions inadequately demonstrated her competency. Additionally, Appellant analogizes the competency evaluation conducted here to those conducted in Griffin and Seccia v. State, 689 So.2d 354 (Fla. 1st DCA 1997). In Black, Griffin and Seccia, this court reversed the appellants' convictions, finding that the trial courts had erred by permitting the child witnesses to testify.
In Black, the four-year-old witness said it was "good" to tell a lie. 864 So.2d at 466. Further, the trial court's cursory questions did not demonstrate that the child could recollect facts, narrate those facts, or that she had the "moral sense of the obligation to tell the truth." Id. at 465-66.
In Seccia, the six-year-old child witness could not remember what she received for Christmas less than two months earlier. 689 So.2d at 355-56. She could not state where she went to church, even though she admitted often attending. Id. at 355. She did not know why it was important to tell the truth. Id. at 356.
In Griffin, the trial court did not examine the child witness, who underwent a de minimus competency evaluation before a deposition. 526 So.2d at 755. Most significantly, the child "was not unequivocally capable of separating fact from fantasy." Id. In response to the question about what would happen if she lied to her mother, the child said she would be sent to her room, but not punished. Id. Further, no evidence corroborated her testimony. Id. This court explained that corroborating evidence, while not a prerequisite to a child witness's testimony, was especially important here, as it was not clear the child could accurately recite the facts. Id. at 755-56.
Unlike the situation in Black, the court here extensively questioned N.D.D.N.D.D. demonstrated her intelligence, accurately recounting facts about her life, including Christmas presents received and school, unlike the child in Seccia. Significant corroboration of N.D.D.'s testimony exists: most importantly, Appellant's admission that he touched N.D.D.'s vagina; the family friend's testimony regarding N.D.D.'s physical condition when she picked N.D.D. up from Appellant's home; the Child Protection Team case coordinator's testimony; and Appellant's cousin's testimony. This corroboration significantly distinguishes the situation here from that in Griffin. Additionally, N.D.D. was capable of separating fact from fantasy and knew it was bad to tell a lie, unlike the child witness in Griffin.
*202 The situation here is more analogous to the situation in Baker v. State, 674 So.2d 199 (Fla. 4th DCA 1996), where the Fourth District affirmed the appellant's conviction, finding the child witness competent. The Fourth District reasoned that the child knew her age, where she went to school and church, and could identify the color of clothing. Id. at 200. She possessed a sense of obligation to tell the truth, as she knew it was wrong to lie and that people get into trouble for lying. Id. Additionally, she agreed to answer questions as truthfully as possible. Id. at 200-01.
Similarly, N.D.D. met the requirements for testifying in court. She was capable of observing and recollecting facts and narrating those facts to the court, as she testified about school, her Christmas gifts, her birthday and age. Further, as the trial court recognized, she possessed a moral sense of the obligation to tell the truth because she knew it was wrong to lie, thought something bad would happen if she lied, and promised not to lie. Therefore, we find no abuse of discretion in the trial court's ruling finding N.D.D. competent to testify.

II. Sentencing Issues

A. Double Jeopardy
Appellant argues that the trial court erred in imposing sentence because his dual convictions and sentences for Counts II and III and his convictions and sentences on Counts I and IV were each based on the same episode, thus violating double jeopardy. We review this issue de novo, concluding that no double jeopardy violation occurred. State v. Paul, 934 So.2d 1167, 1171 (Fla.2006).
In Alonso v. State, 834 So.2d 885 (Fla. 3d DCA 2002), the Third District held that multiple convictions based on distinctly charged acts occurring at different times, which are supported by competent, substantial evidence, do not violate double jeopardy. In Saavedra v. State, this court said, "The sexual battery statute may be violated in multiple, alternative ways. . . . However, the fact that the same victim is sexually battered in the same manner more than once in a criminal episode by the same defendant does not conclusively prohibit multiple punishments." 576 So.2d 953 (Fla. 1st DCA 1991) (internal citations omitted).
As in Alonso, the record here demonstrates that multiple offenses occurred, including several incidents of digital penetration and touching of N.D.D.'s vagina, coupled with incidents of kissing and fondling her breasts, occurring throughout a one-year period. N.D.D. testified that Appellant rubbed her vagina "a lot" of times and touched and kissed her breasts. Appellant admitted touching her vagina four times and digitally penetrating her once or twice. This case does not involve a single criminal episode or a lack of evidence to support multiple convictions and sentences; therefore, no double jeopardy violation occurred.

B. Victim-Injury Points Assessed For Sexual Contact
Appellant also argues that the trial court erred in assessing 40 victim-injury points for attempted sexual battery, because the jury did not specifically find that he had sexual contact with N.D.D. in committing this offense. A trial court's order scoring victim injury points is reviewed for an abuse of discretion. McDonald v. State, 520 So.2d 668 (Fla. 1st DCA 1988).
The trial court calculated a 120-point score for sexual contact based on Appellant's conviction of attempted sexual battery and two counts of lewd and lascivious molestation. The State argues that the nature of the attempted sexual battery offense required it to prove that Appellant *203 had some type of sexual contact with N.D.D.
In Grant v. State, 783 So.2d 1120 (Fla. 1st DCA 2001), this court held that the trial court erred in assessing sexual contact points based on a jury verdict of attempted lewd and lascivious molestation, reasoning that the jury could have found the appellant attempted to touch the victim, but failed, as it convicted the appellant of only an attempt. In Luhrsen v. State, 702 So.2d 596 (Fla. 2d DCA 1997), the Second District reversed the appellant's sentence where the trial court scored victim injury points for sexual penetration, because the appellant was only charged with lewd and lascivious acts without committing sexual battery. However, in Marcado v. State, 735 So.2d 556 (Fla. 3d DCA 1999), the Second District held that the trial court correctly scored 40 points for sexual contact when the appellant was convicted of attempted sexual battery. Similarly, in Vural v. State, 717 So.2d 65 (Fla. 3d DCA 1998), the Third District held that the trial court erred by not imposing points for sexual contact where the appellant was convicted of attempted sexual battery because he attempted to force the victim to perform oral sex, but only succeeded in forcing the victim to handle and masturbate him.
Here, Appellant was charged with sexual battery based on sexual penetration or union with his penis. The jury heard evidence that Appellant put his penis in contact with N.D.D.'s vagina. While Appellant denied any sexual intercourse with N.D.D., he admitted digitally penetrating her once or twice and touching her vagina. Clearly the jury found that Appellant somehow put his penis in contact with N.D.D.'s vagina, as otherwise it could not have convicted him of attempted sexual battery. See Marcado, 735 So.2d at 557-58. The trial court scored points for sexual contact, consistent with N.D.D.'s and Appellant's testimony and the jury's finding that Appellant somehow put his penis in contact with N.D.D.'s vagina. Accordingly, we find the trial court did not abuse its discretion in assessing 40 victim injury points based on sexual contact.
We find Appellant's argument based on Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), is without merit, as the assessment of 40 points for sexual contact did not increase Appellant's sentence beyond the statutory maximum of 30 years' imprisonment because the trial court only sentenced Appellant to 225 months' imprisonment.
Because the court did not err in finding N.D.D. competent to testify or err in sentencing Appellant, we affirm his conviction and sentence.
AFFIRMED.
VAN NORTWICK and LEWIS, JJ., concur.