PER CURIAM.
Theodore Rodgers, Jr., appeals an order of the circuit court denying his motion to vacate his conviction of first-degree murder and his sentence of death filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the circuit court’s order.
I. BACKGROUND
In 2003, Theodore Rodgers, Jr., was convicted of the 2001 first-degree murder of his wife, Teresa Henderson. On direct appeal, this Court set out the facts of the crime:
Theodore Rodgers, then sixty years old, was self-employed in Orlando, installing lawn irrigation systems and doing other plumbing work. On the morning of February 14, 2001, he took his stepson to a .court appearance and then went to work on a plumbing job at a customer’s (the Jacksons) home. After determining that he needed more supplies, Rodgers drove to the daycare business that his wife Teresa operated and where he stored some materials. As he walked down the interior hallway, his wife’s ex-husband ran past him, wearing only a pair of pants and carrying his shirt and *765 shoes. Rodgers confronted his wife, saying that he was leaving her. Then he loaded his supplies and returned to his earlier job.
Later, Rodgers drove to Kissimmee, where he met his longtime friend and occasional business partner James Cor-bett. Together they estimated a job for a potential client. Rodgers acted normally and did not mention the morning’s incident to Corbett. Afterwards, Rodgers drove to his mechanic’s shop to discuss a problem with his work truck, and then called Verna Fudge, another longtime friend and former girlfriend. He wanted to talk to her about finding a place to stay, but she was working and told him to call later. Rodgers again returned to his customer’s home to complete the job. The Jacksons, who had known Rodgers for many years, testified that he did not seem upset and was “just the same Ted [they had] always known.”
Rodgers went home and talked to Corbett on the phone about a job. Later, Rodgers called Corbett and said that he was going to kill his wife because he was “tired of her doing what she’s doing”; he was “fixing to take care of this problem.” Rodgers drove to the daycare. Three young children present there witnessed what happened next. Teresa unlocked the door and admitted Rodgers. They argued and Rodgers slapped and kicked her and knocked her down. Then he walked into a back room of the daycare. Teresa tried to open the front door while talking on the telephone. Rodgers returned "with a gun, fired several shots at her, and left.
Meanwhile, Tashunda Lindsey, the victim’s daughter, was returning to the daycare after running an errand when she called her mother during the argument. Teresa screamed for help, and as Lindsey approached the daycare, she heard gunshots and saw Rodgers walk to his truck and drive away. She found her mother dying in the doorway of the center.
Rodgers drove to a pool hall, where he encountered two friends — Wendy Hammock and Cleveland Reed — sitting in a car. Rodgers told them, “I just shot my wife,” and asked to borrow Hammock’s cell phone. He dialed a number and said, “James [Corbett], man, I did it. I killed Teresa. It’s been nice knowing you. Thank you for everything you did. But I got to go.” He told Hammock and Reed that he killed Teresa because he caught her with another man. He added that he had to kill himself because he could not go to jail. Walking a short distance away, Rodgers shot himself in the head.
[[Image here]]
Rodgers testified that he killed his wife accidentally in self-defense. According to appellant, after he finished the job for the Jacksons, he went home and discussed business with Corbett on the phone, but did not threaten to kill his wife. Rodgers then received a call from a woman in Rosemont requesting a job estimate. While he was en route to Rosemont, his wife called twice on his cell phone, but he refused her requests to go to the daycare to talk. On an impulse, however, he decided that he would go but did not tell her.
When he arrived, his wife was lying on a chair, and'he saw that the children were in an adjoining room. He and his wife were talking, not arguing, when his wife walked toward him saying, “You all about to run me crazy.” She then fired a gun at him. He reached for the gun, and during their struggle over it, the gun fired several times. Realizing Teresa had been shot, Rodgers took the gun and left because he was “scared and upset.” He was not injured in the struggle. Rodgers denied telling Cor- *766 bett, Hammock, or Reed that he killed Teresa, saying that he told them she was shot when they struggled over a gun.
Rodgers v. State, 948 So.2d 655, 659-61 (Fla.2006).
During the penalty phase, the State presented Rodgers’ 1963 conviction for robbery and his 1979 conviction for manslaughter of his live-in girlfriend, two witnesses who testified to the circumstances of the latter conviction, and Dr. Greg Prichard, a clinical psychologist, who concluded that Rodgers was not mentally retarded. The defense called several lay witnesses and Dr. Eric Mings, a psychologist, who described Rodgers’ difficult youth, inadequate education, and adult life. Dr. Mings testified that Rodgers had an IQ of 69 and was mentally retarded. Id. at 661. In addition, the trial court held a combined mental retardation and Spencer v. State, 615 So.2d 688 (Fla.1993), hearing. Dr. Mings again testified that Rodgers was mentally retarded, and two independent experts testified that Rodgers was not mentally retarded. Rodgers, 948 So.2d at 661.
The jury recommended a death sentence by a vote of eight to four. The trial court concluded that Rodgers was not mentally retarded and followed the jury’s recommendation. The trial court found the aggravating factor of a prior violent felony— based on the robbery and manslaughter convictions — the statutory mitigating factor of other factors in the defendant’s background — based on Rodgers’ impoverished upbringing — and several nonstatuto-ry mitigating factors, such as Rodgers’ borderline intelligence, his fatherless childhood, his lack of access to education, his generosity and kindness to others, and the love and support of his family. The trial court concluded that the aggravating factor was entitled to “extremely great weight” and outweighed the mitigating factors.
Rodgers raised seven issues on direct appeal. He asserted that the trial court erred: (1) by excusing a potential juror for cause; (2) by admitting hearsay testimony during the penalty phase; (3) by admitting Rodgers’ IQ scores from the Department of Corrections’ records; (4) in determining that Rodgers is not mentally retarded; (5) in finding the mitigating circumstances, weighing the aggravating and mitigating circumstances, and determining proportionality; (6) in denying Rodgers’ motion for disqualification; and (7) in failing to find Florida’s death penalty scheme unconstitutional. Rodgers, 948 So.2d at 662. This Court determined that the trial court erred in admitting certain hearsay testimony during the penalty phase, but the majority concluded that the error was harmless. Accordingly, this Court affirmed Rodgers’ conviction and sentence. Id. at 662-74.
In June 2009, Rodgers filed a motion for postconviction relief, raising seven claims. The circuit court conducted an evidentiary hearing, during which Rodgers called four attorneys who worked on his case — Gerod Hooper, George Couture, Junior Barrett, and Rowana Williams; two mental health experts — Dr. Harry Krop, a psychologist, and Dr. Joseph Wu, a psychiatrist; and a psychologist who specializes in testimony by child witnesses — Dr. Sherrie Bourg Carter. The State called Dr. Lawrence Holder, a radiologist, to rebut Dr. Wu’s testimony regarding PET scans of Rodgers’ brain. In October 2011, the circuit court issued an order denying relief. Rodgers now appeals the circuit court’s order.
II. ANALYSIS
On appeal, Rodgers contends that the postconviction court should have granted *767 relief on his claims that: (A) trial counsel was ineffective for failing to investigate and present evidence that Rodgers has organic brain damage; (B) trial counsel was ineffective regarding the child witnesses who testified at Rodgers’ trial; (C) trial counsel was ineffective in failing to establish that the gun used in the homicide belonged to the victim’s ex-husband; and (D) the trial court erred in determining that Rodgers knowingly and voluntarily waived his right to dress in non-jail clothing during the penalty phase. Rodgers does not appeal the denial of his remaining three claims: trial counsel was ineffective for failing to introduce Rodgers’ cell phone records; trial counsel was ineffective for failing to adequately investigate Rodgers’ 1963 robbery conviction; and Florida’s lethal injection process violates the Eighth Amendment to the United States Constitution. We affirm the postconviction court’s decision.
A. Ineffective Assistance Regarding Organic Brain Damage
In his first ineffective assistance of counsel claim, Rodgers argues that his penalty phase counsel was ineffective for failing to present evidence that Rodgers suffers from brain damage. Rodgers asserts that while trial counsel had him evaluated by mental health experts, trial counsel erred by not ensuring that Rodgers received a full neuropsychological examination. Rodgers further asserts that such an examination would have revealed that Rodgers suffers from brain damage and that this additional mitigating evidence would have led to a life sentence.
To prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to the first prong, the defendant must establish that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Id.; see also Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995). For the second prong, “Strickland places the burden on the defendant, not the State, to show a ‘reasonable probability’ that the result would have been different.” Wong v. Belmontes, 558 U.S. 15,130 S.Ct. 383, 390-91, 175 L.Ed.2d 328 (2009) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Strickland does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). This Court employs a mixed standard of review, deferring to the postconviction court’s factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).
To evaluate the merits of this claim, we first review the relevant evidencé presented during the penalty phase of Rodgers’ trial and then summarize the evidence presented at the postconviction evidentiary hearing.
During the penalty phase, the defense called psychologist Dr. Eric Mings. Dr. Mings testified about Rodgers’ disadvantaged childhood, including the lack of safety precautions regarding the use of pesticides on the family’s farm, and Rodgers’ employment history, reliance on the assistance of family or girlfriends for his daily needs, financial practices, and dysfunctional relationships. The bulk of Dr. Mings’ testimony, however, pertained to his diag *768 nosis that Rodgers suffered from mental retardation. Based on the evidence of Rodgers’ lifestyle and the psychological testing, Dr. Mings opined that Rodgers was mildly mentally retarded. Dr. Mings explained that due to his mental retardation, Rodgers likely would become confused and overwhelmed in emotionally charged circumstances, would have difficulty seeing alternatives, would have difficulty living independently, and would have a reduced ability to reason. He also stated that a common coping mechanism for those with mental retardation is to become defensive and that he had observed Rodgers act defensively while Rodgers was testifying.
In light of these difficulties and the evidence that on the day of the murder Rodgers was distressed due to his wife’s affair, Dr. Mings opined that four statutory mitigating factors were established: (1) Rodgers acted under the influence of extreme mental or emotional disturbance; (2) Rodgers acted under extreme duress; (8) Rodgers’ capacity to conform his behavior to the requirements of law was substantially impaired; and (4) Rodgers’ intellectual age was that of a grade-school child.
In addition to testifying about mental retardation, Dr. Mings was asked about the possibility that Rodgers had brain damage. Dr. Mings testified that some of the documents he reviewed were medical records prepared after Rodgers shot himself in 2001. Dr. Mings stated that these radiology and neurology reports “indicated there was no evidence of any brain damage.” Dr. Mings further testified that when he was first retained, he was asked to do a full battery of neuropsychological tests. Dr. Mings explained that after conducting an initial investigation, he decided that a full battery would not be useful:
I didn’t do more tests because after I did the initial interview, spoke with him, later when I did the intellectual tests and I saw the IQ score, and I put together his social history as I knew it, and the IQ score, I was concerned about the issue of retardation. When you do a neuropsychological test, a full battery, typically what you are presuming as an adult, some point in time they have normal functioning and you have a baseline by which to compare them doing badly on individual kind of things. When you have somebody like him, who had the IQ score that he did with a flat profile with very little diagnosis of any strengths or weaknesses, it would have been quite difficult, if not impossible, to interpret his deficits on more specific neuropsy-chological tests because he had such low overall intellectual abilities.
Dr. Mings clarified that if the WAIS-III IQ test had identified areas of comparative strength and weakness — which would point to specific areas of brain injury — he would have investigated further. When asked why he did not administer the Wisconsin Card Sorting Test or other tests in an effort to evaluate Rodgers’ frontal lobe functioning, Dr. Mings stated that he believed that Rodgers would perform poorly on such tests but that those results would have been “meaningless considering [Rodgers’] overall IQ score.” Finally, Dr. Mings testified that while he and counsel may have discussed the possibility of a PET scan, he does not normally request a PET scan as part of his evaluation and he particularly would not have requested one in this case, where there were existing medical records showing that Rodgers did not have brain damage.
As part of the joint mental retarda-tionJSpencer hearing, the defense presented to the trial court a report prepared by Dr. Gamache, a neuropsychologist. Dr. Gamache’s report indicated that to evaluate Rodgers, he conducted a mental status examination, diagnostic clinical interview, a neuropsychological history, neuropsycho- *769 logical testing, and a structured interview regarding the offense. Dr. Gamaehe concluded that although Rodgers may have experienced a few head injuries, “there [was] no clear indication of symptoms that would be suggestive of any undiagnosed neurological condition.” Dr. Gamaehe closed his report by inviting counsel to inquire if counsel had “any additional questions regarding the neuropsychological evaluation of Mr. Rodgers.”
During the postconviction evidentiary hearing, Rodgers called the attorneys who represented him at trial, Dr. Harry Krop, a psychologist, and Dr. Joseph Wu, a psychiatrist. The State called Dr. Lawrence Holder, a radiologist with a specialty in nuclear medicine.
Both of Rodgers’ penalty phase trial attorneys testified that they had no reason to suspect that Rodgers suffered from brain damage. Attorney Couture testified that in 2001, Rodgers shot himself and that, as part of the defense’s trial investigation, the defense obtained copies of CAT scans of Rodgers’ brain and a neurological examination from the hospital that treated Rodgers. Attorney Couture testified that the medical personnel who treated Rodgers concluded that the gunshot wound did not cause brain damage and that the CAT scans were provided to Dr. Mings, who also opined that there was no organicity. Attorney Hooper added that while in some cases Dr. Mings has recommended a neu-ropsychological examination, in this case, Dr. Mings reported back about mental retardation without raising any concern about brain damage and that Dr. Ga-mache, who evaluated Rodgers between the penalty phase and the Spencer hearing, also did not recommend any further testing. Attorney Hooper concluded: “Had anybody, Dr. Mings, Dr. Gamaehe, requested a PET scan, CAT scan, any additional testing, I would have had them do it or had it done.”
Dr. Harry Krop testified that he reviewed materials pertaining to Rodgers and conducted a neuropsychological evaluation of Rodgers in August 2009. Dr. Krop diagnosed Rodgers as suffering from a cognitive disorder not otherwise specified, likely caused by impairment of the frontal lobe. Dr. Krop explained that Rodgers’ cognitive disorder would adversely affect problem-solving and impulse control, making Rodgers “more likely to become frustrated to — impulsively to use poor judgment, to not reason things through and so forth.” Dr. Krop further explained that while, as a psychologist, he cannot identify a medical cause of Rodgers’ cognitive disorder, the cognitive disorder suggests physiological brain damage and likely dates back to at least 2001. Dr. Krop then contrasted mental retardation, which does not necessarily impact a person’s ability to control his emotions, from impaired executive functioning due to brain damage, which does affect emotional control. Overall, Dr. Krop opined that Rodgers’ emotional impairment “would be classified in the moderate range.”
Dr. Wu testified that he reviewed and interpreted PET scans performed on Rodgers. Dr. Wu explained that PET scans, which image the brain’s functioning, are more sensitive and accurate for identifying mild or traumatic brain injury than are CT or MRI images, which look at brain structure. Dr. Wu further explained that in Rodgers’ case, the PET scans were performed using the continuous performance test method, in which fludeoxyglucose uptake is evaluated while the subject performs a visual vigilance task, rather than the conventional method that evaluates a patient while at rest.
Dr. Wu diagnosed two abnormalities in the metabolism of Rodgers’ brain. First, Dr. Wu opined that Rodgers’ brain was abnormally less active in the front than in *770 the back. Dr. Wu testified that frontal lobe impairment like Rodgers’ is associated with substance abuse, depressive disorders, impulse disorders, attention deficit disorder, and aggressive behavior, such as disproportionate reactions to provocation, but Dr. Wu clarified that a neuropsychologist would be needed to identify the cause of the hypo-frontal pattern. Second, Dr. Wu opined that Rodgers’ parietal lobes were asymmetrical. While some degree of asymmetry is normal, Dr. Wu concluded that the right side of Rodgers’ parietal lobe was significantly less active than the left side. Dr. Wu conceded that a gunshot wound to the head could have caused the abnormalities identified by the PET scans.
Dr. Holder, in contrast, reviewed the same PET scans and concluded that the results were “all within normal limits” and not indicative of brain abnormality. Regarding Rodgers’ frontal lobe, Dr. Holder explained that frontal activity decreases with age and that at Rodgers’ age, it can be normal to have more activity in the back than in the front. Dr. Holder further explained that the visual stimulation used in the continuous performance test method can activate the “visual cortices way in the back [rather] than in the more anterior areas.” Dr. Holder also opined that the variation between Rodgers’ parietal lobes was within the limits of normal human variation.
The postconviction court concluded that Rodgers’ claim was without merit. The postconviction court determined that trial counsel’s investigation of Rodgers’ mental health — which included evaluations by two qualified mental health experts— was reasonable and that, even if counsel erred, Rodgers did not establish prejudice. We affirm the circuit court’s decision. Rodgers did not demonstrate that counsel was deficient or that he was prejudiced.
“This Court has established that defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire.” Darling v. State, 966 So.2d 366, 377 (Fla.2007) (citing State v. Sired, 502 So.2d 1221, 1223 (Fla.1987)). Even if the original expert’s evaluation “was somehow incomplete or deficient in the opinion of others, trial counsel would not be rendered ineffective for relying on [the] qualified expert evaluation.” Id.; see also Stewart v. State, 37 So.3d 243, 253 (Fla.2010) (“Stewart did not prove that a reasonable trial attorney should have known to not rely on the conclusions offered by the mental health experts who evaluated him. Thus, he did not prove that his counsel was deficient.”).
In both Darling and Stewart, this Court rejected a claim that counsel should have ordered a neuropsychological evaluation of the defendant, concluding that counsel acted reasonably in relying on the defense’s mental health expert who did not recommend a neuropsychological evaluation. For the same reason, Rodgers’ claim of ineffective assistance of counsel is without merit.
Defense counsel hired psychologist Dr. Mings to evaluate Rodgers in preparation for the penalty phase. During the penalty phase, Dr. Mings testified that he concluded that a neuropsychological evaluation would not be helpful in Rodgers’ case due to Rodgers’ low IQ, which in his opinion would make it difficult to interpret the results of a neuropsychological battery. Dr. Mings also based his recommendation, in part, on recent radiologist and neurologist reports that concluded that Rodgers did not have brain damage. In addition, Dr. Mings concluded that Rodgers’ behavior was adequately explained by a diagnosis of mild mental retardation. While Rodgers asserts that Dr. Mings did not conduct a sufficient evaluation, he has not *771 challenged Dr. Mings’ qualifications as a mental health expert. Furthermore, despite Dr. Mings’ recommendation against neuropsychological testing, once the jury recommended a death sentence, counsel retained another expert to investigate Rodgers’ neuropsychological functioning. The defense retained Dr. Gamache to examine Rodgers and presented Dr. Ga-mache’s report to the trial court in an effort to persuade the trial court not to follow the jury’s recommendation. Counsel was not deficient for relying on these mental health experts.
Rodgers also has failed to prove prejudice. The evidence presented during the postconviction evidentiary hearing does not undermine confidence in the jury’s recommendation or the trial court’s sentencing decision.
First, Dr. Krop did not assert that Rodgers’ alleged frontal lobe impairment rises to the level of statutory mitigation. Instead, Dr. Krop opined that Rodgers’ emotional impairment “would be classified in the moderate range” and did not discuss any other statutory mitigating factors. Thus, there would be no additional competent, substantial evidence on which the jury or judge could find “extreme” mental or emotional disturbance or any other mitigating factor. See § 921.141(6)(b), Fla. Stat. (2003).
Second, the postconviction evidence would not significantly change the evaluation of nonstatutory mitigation. The evidence that Rodgers may have a brain impairment that interferes with his ability to reason and causes him to be aggressive is generally cumulative to what was presented to the jury and the trial court. Dr. Mings testified during the penalty phase that due to his impaired intellectual functioning, Rodgers was likely to become confused and overwhelmed in emotionally charged circumstances and was likely to have difficulty seeing alternative ways to resolve conflicts. Dr. Mings further testified that for individuals with mental retardation, a common coping mechanism is to become defensive and that he had seen Rodgers act defensively when confused.
Third, the additional expert testimony that Rodgers had difficulty controlling his emotions and impulses would not resolve the inconsistency between Rodgers’ claim of impulsiveness as mitigation and the evidence at trial that established that Rodgers did not act impulsively when he killed his wife. As this Court explained on direct appeal, the following evidence refuted Rodgers’ argument that his crime was mitigated by his inability to control his impulses:
Rodgers and all the other witnesses testified that after Rodgers confronted his wife, in the morning, he put in a full day’s work and interacted normally with people who knew him. He also telephoned Verna Fudge, a longtime friend and minister who frequently counseled him on his marital and other problems and with whom he previously had discussed his belief that Teresa was having an affair with her ex-husband. Rodgers told her he was leaving his wife and asked Fudge for help finding a place to stay. Further, Rodgers testified that hours later he went to the daycare to •talk to his wife. He said that she surprised him when, without any provocation, she shot at him, and that she was killed in the ensuing struggle. As the trial court noted, Rodgers had ample time for reflection before telling Corbett late in the day that he intended to kill his wife and then going to the daycare to do so....
.... After a day of behaving reasonably and responding normally in a variety of situations, Rodgers announced his intention to kill his wife in advance of going to the daycare, bragged about it *772 afterward, and attempted to kill himself to avoid going to prison. Further, he testified that although he was upset, he was not angry with his wife, and claimed the killing occurred in self-defense.
Rodgers, 948 So.2d at 668-69 (footnotes omitted). Given the events leading up to Henderson’s death, the posteonviction evidence that Rodgers may have had frontal lobe impairment does not undermine confidence in the sentence.
Instead, Rodgers’ case is analogous to Owen v. State, 986 So.2d 534, 552-53 (Fla. 2008), in which this Court determined that additional mental health mitigation did not undermine confidence in the sentence where the murder was “calculated” and “deliberate” and the posteonviction expert “did not offer an opinion as to whether Owen’s actions on the night of the offense demonstrated impulsivity.” See also Everett v. State, 54 So.3d 464, 483 (Fla.2010) (“However, to the extent that Dr. Mhatre’s testimony supports a theory that Everett committed the crimes while under a drug-induced paranoia, such a theory is undermined by the facts in Everett’s case.”); Hoskins v. State, 965 So.2d 1,17 (Fla.2007) (“The facts of the murder are inconsistent with a claim that Hoskins was under the influence of an extreme mental or emotional disturbance.”).
B. Ineffective Assistance Regarding the Child Witnesses
Next, Rodgers contends that the post-conviction court erred in denying his motion to vacate because trial counsel was constitutionally ineffective for making the following errors regarding the three children who testified that they witnessed Rodgers shoot Henderson. First, defense counsel did not challenge the competency of the children to testify at trial. Second, defense counsel should have more aggressively cross-examined the children or called an expert like Dr. Carter, who could have pointed out inconsistencies in the children’s testimony beyond those raised by defense counsel in cross-examination. And third, defense counsel failed to adequately cross-examine Detective Chiota about the procedures and protocols that apply to child witnesses, as outlined by Dr. Carter.
Again, to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. This Court employs a mixed standard of review, deferring to the posteonviction court’s factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor, 883 So.2d at 771-72. We conclude that the circuit court did not err in denying this claim.
First, Rodgers did not establish that trial counsel was ineffective for failing to challenge the competency of the child witnesses. During the posteonviction evi-dentiary hearing, attorney Barrett testified that prior to trial, he deposed the children and that — based on their demean- or at the depositions — he felt that there was no reason to challenge their competency. This Court has previously concluded that an attorney may make a reasonable strategic decision to not challenge child witnesses based on his impression of the witnesses’ ability to testify. For example, in Floyd v. State, 18 So.3d 432, 444 (Fla.2009), this Court concluded that counsel acted reasonably by not challenging the competency of two minor witnesses where counsel had deposed both children and observed that the children “answered the questions clearly and consistently,” except for a “few minor discrepancies,” and the witnesses “corroborated each other.” In this case, Rodgers’ counsel had a similar *773 basis for deciding not to challenge the witnesses’ competency. Counsel deposed the witnesses prior to trial and observed the witnesses’ demeanor at trial as they responded to the state attorney’s inquiries related to competency. Further, Rodgers has not alleged that the witnesses’ deposition testimony failed to corroborate one another on the critical points, such as Rodgers being the person who retrieved the gun and the fact that Rodgers shot Henderson during an argument. Thus, Rodgers’ counsel was not deficient.
Rodgers also has not proved prejudice. A defendant does not establish prejudice from counsel’s failure to object to the competency of witnesses where — as in this case — the record demonstrates that the “child witnesses were sufficiently examined and properly qualified by the court.” Floyd, 18 So.3d at 444; cf. Carratelli v. State, 961 So.2d 312, 324 (Fla.2007) (“[Wjhere a postconviction motion alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror was actually biased.”).
“It is the established law of this state that if an infant witness has sufficient intelligence to receive a just impression of the facts about which he or she is to testify and has sufficient capacity to relate them correctly, and appreciates the need to tell the truth, the infant should be permitted to testify.” Lloyd v. State, 524 So.2d 396, 400 (Fla.1988). When evaluating the competency of a child, the trial court should consider (1) whether the child is capable of observing and recollecting facts; (2) whether the child is capable of narrating those facts to the court or to a jury; and (3) whether the child has a moral sense of the obligation to tell the truth. Floyd, 18 So.3d at 443-44.
In Floyd, 18 So.3d at 444, this Court determined that the trial court’s inquiry into the children’s competency to testify was sufficient where “LaJade proved her intelligence level by correctly counting numbers,” “reciting the alphabet,” and attesting to her “obligation to tell the truth ‘no matter what’ ” and where J.J. established his competency by reporting “his education level and the subjects he studied in school,” making “an earnest effort to pass the judge’s ‘quiz’ on mathematics,” and expressing an understanding of “the concept of lying, the consequence of lying, and his obligation to tell the truth.” Similarly, in Baker v. State, 674 So.2d 199, 200 (Fla. 4th DCA 1996), the Fourth District Court of Appeal determined that the trial court did not abuse its discretion by permitting testimony from a six-year-old who “proved her intelligence by knowing her age, where she went to school, where she went to church and could identify the colors of people’s clothing” and testified “that she knew it was wrong to lie, and that people get into trouble for lying.” Likewise, in Bennett v. State, 971 So.2d 196, 202 (Fla. 1st DCA 2007), the First District Court of Appeal concluded that the trial court did not abuse its discretion by allowing a child to testify where the child was able to testify “about school, her Christmas gifts, her birthday and age” and asserted that she “thought something bad would happen if she lied.”
The children in this case, who were ages eight, nine, and ten when they testified, were examined prior to their substantive testimony and demonstrated that they were capable of observing, recollecting, and reporting facts and that they had a moral sense of the obligation to tell the truth. The questioning of the children is particularly similar to the questioning in Baker and Bennett, in which the children were asked about their ages, their schools, and what happens when one lies. The children in this case correctly reported information about themselves and their family, including where they attended *774 school and that they enjoy watching the program Judge Mathis on television. And while the state attorney did not use the exact phrase “moral obligation,” she did elicit testimony from each of the children establishing that each understood that it would be wrong to lie while on the stand. Because the key points established by Lloyd were addressed, Rodgers has not demonstrated that the inquiry into the children’s competency was so inadequate that a reasonably competent attorney should have objected.
Second, Rodgers’ claim that defense counsel was ineffective for failing to more aggressively cross-examine the child witnesses about inconsistencies between their interviews, depositions, and trial testimony, or for failing to call an expert witness to raise those inconsistencies is without merit. Rodgers has not proven deficiency. Defense counsel cross-examined the child witnesses on some, but not all, of the inconsistencies between their various statements. This Court has previously concluded that limiting the cross-examination of child witnesses is a reasonable trial strategy because “an attorney who aggressively questions a distressed child runs a high risk of alienating jurors, something which a capital defendant should avoid.” Floyd, 18 So.3d at 444. Thus, while the witnesses’ credibility was material to the State’s case, Rodgers’ counsel was not deficient for not more aggressively cross-examining the children.
And finally, Rodgers’ third claim related to the child witnesses—that counsel was ineffective in his cross-examination of Detective Chiota—is without merit. Rodgers contends that counsel was ineffective for failing to challenge Detective Chiota regarding the procedures he used to interview the children. Rodgers presented Dr. Carter to explain how a law enforcement officer should act when interviewing young children and to critique Detective Chiota’s interviews of the children. The State did not, however, introduce the interviews between the children and Detective Chiota into evidence at trial or ask Detective Chiota to testify about the information that was conveyed during the interviews. Instead, Detective Chiota merely testified that the interviews occurred two days after the homicide, with the children’s mother present, without detailing the content of the interviews. Since the jury and the trial court never heard the substance of Detective Chiota’s interviews and the claim that any improper techniques employed in the interviews irrevocably tainted the children’s later trial testimony is speculative, Rodgers has not demonstrated that reasonably competent counsel would have cross-examined Detective Chiota about his interview techniques or that the lack of cross-examination undermines confidence in his conviction or sentence.
C. Ineffective Assistance Regarding Ownership of Murder Weapon
Rodgers asserts that his defense counsel was ineffective for failing to present evidence to establish ownership of the gun used to shoot Henderson. Pursuant to Strickland, 466 U.S. at 687, 104 S.Ct. 2052, to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel’s performance was deficient and that the deficient performance prejudiced the defendant. This Court defers to the postconviction court’s factual findings but reviews legal conclusions de novo. See Sochor, 883 So.2d at 771-72. The postconviction court did not err in denying this claim. Rodgers did not prove deficiency or prejudice.
During trial, the State called witness Ronald Murdock, a crime scene technician with the Orange County Sheriffs Office. On cross-examination, defense counsel *775 asked Murdock if he investigated who owned the gun collected from the crime scene. Murdock answered that he sent a trace request to the Department of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF). When defense counsel asked who owned the gun, the State objected on the basis of hearsay, and the trial court sustained the objection. Rodgers asserts that defense counsel should have called a witness through which the ATF trace summary could have been admitted pursuant to section 90.808(6), Florida Statutes (2003), which excludes records of regularly conducted business activity from the definition of inadmissible hearsay.
To admit a document into evidence pursuant to the business record exception, the proponent must show that the record was “kept in the course of a regularly conducted business activity” by presenting the “testimony of the custodian or other qualified witness” or by presenting a sufficient “certification or declaration.” § 90.803(6)(a), Fla. Stat. (2003). In his postconviction motion, Rodgers alleged that Records Custodian Denise Brown of the Orlando Police Department was available to testify, and at the evidentiary hearing, Rodgers produced the trace summary that showed that the gun was registered to Willie B. Odom, Henderson’s ex-husband. The State stipulated to the admissibility of the trace summary for purposes of the postconviction evidentiary hearing but argued that because the document was created by the ATF — not the Orlando Police Department — in order to admit the document into evidence at trial, the defense would have to call a records custodian from the ATF or produce an appropriate certification to authenticate the document. Despite the fact that the evidentiary hearing was continued, the defense did not secure a witness or certification to authenticate the ATF trace summary.
The defendant bears the burden of proof for both prongs of an ineffective assistance of counsel claim. Freeman v. State, 761 So.2d 1055, 1062 (Fla.2000). Because Rodgers did not present a witness or a certification to establish the predicate for admitting the ATF trace summary, Rodgers did not prove that reasonably competent trial counsel could have admitted the trace summary into evidence at trial. As a result, Rodgers has not established deficiency. See, e.g., Evans v. State, 995 So.2d 933, 945 (Fla.2008) (“However, without introducing the deposition into the record, which would enable the Court to determine whether counsel was aware of this information, Evans cannot demonstrate that counsel was deficient for failing to investigate further.”); Peede v. State, 955 So.2d 480, 497 n. 4 (Fla.2007) (concluding that because the admissibility of the diary was questionable, Peede did not prove that counsel was deficient for failing to introduce the diary).
And even assuming that reasonable counsel could have authenticated and introduced the trace summary, Rodgers has not established prejudice. As for the guilt phase, Rodgers contends that the evidence would have supported the defense’s argument that Rodgers did not bring the gun to the daycare and that Rodgers was less likely to know where the gun was located in the daycare than was Henderson. Rodgers overlooks that the State did not argue that he brought the gun to the daycare. During its guilt-phase opening statement, the State asserted that according to the children who witnessed the shooting, Rodgers “left the immediate area of the front door and living room and went to a back room, and ... came out with a gun.” Likewise, during guilt-phase closing statements, the State continued to argue that Rodgers retrieved the gun from another room in the daycare, not that he *776 brought the gun with him. Furthermore, while the evidence that the gun was registered to Odom could support the inference that Henderson knew where the gun was located, it neither negates nor supports the proposition that Rodgers knew where the gun was located in his wife’s place of business.
As for the penalty phase, Rodgers asserts that the presence of Odom’s property in the daycare would bolster the defense’s argument that Rodgers was emotionally distressed at the time of the murder due to his wife’s affair with Odom. This argument for prejudice is without merit. The evidence that the murder weapon was registered to Odom “merely would have lent further support to ... a fact already known to the jury” and judge. Cherry v. State, 781 So.2d 1040, 1051 (Fla.2000).
Throughout the trial, the State presented evidence that Odom was a friend of Henderson’s family who spent time at the house that was used as a daycare. Tash-unda Lindsey — Henderson’s daughter— testified that before her mother was married to Rodgers, Henderson, Odom, and the children lived in the house that later became Henderson’s daycare. Lindsey further testified that Odom was still friends with her and her siblings and that on the day of the murder, Odom picked up Lindsey from the daycare to run errands with her. The three children who witnessed the shooting confirmed that they had seen Odom at the daycare. In addition, defense witness Verna Fudge, Rodgers’ ex-girlfriend, testified that as early as December 2000, Rodgers had expressed to her that he had seen Henderson and Odom together and that he believed they were having an affair. Due to this evidence that Odom had been at the daycare and had an on-going relationship with Henderson and her family, the jury was aware of this source of tension between Rodgers and Odom. Given that the relationship between Henderson and Odom was established by several witnesses, the presence of a piece of Odom’s personal property in the daycare would be cumulative. As a result, the failure to present evidence regarding the gun registration does not undermine confidence in Rodgers’ sentence.
D. Rodgers’ Clothing During Penalty Phase
The postconviction court did not err in denying Rodgers’ claims that he did not knowingly and voluntarily waive his right to be free from compulsion to wear jail clothing during trial and that counsel acted ineffectively by advising him to wear jail clothing during the penalty phase.
The first portion of this issue on appeal is proeedurally barred. Any question of the validity of Rodgers’ waiver should have been raised on direct appeal. See, e.g., Johnson v. State, 921 So.2d 490, 505 (Fla.2005) (concluding that postconviction claim that law enforcement officers coerced defendant into waiving his Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights was proeedurally barred because the claim could have been raised on direct appeal).
Turning to the ineffective assistance of counsel portion of this claim, Rodgers did not prove that trial counsel’s performance was deficient or that the allegedly deficient performance prejudiced him. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. “[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). “The issue is not what present counsel or this Court might now view as the best strategy, but rather whether the strategy was within the broad range of discretion afforded to counsel ac *777 tually responsible for the defense.” Id. at 1049. In this case, the record demonstrates that trial counsel made a reasonable strategic decision to have Rodgers wear jail clothing during the penalty phase. Accordingly, the postconvietion court did not err in denying this claim.
In this case, attorney Hooper considered which alternative — jail clothing or street clothing — would better support his argument in favor of a sentence of life in prison. At the postconviction evidentiary hearing, attorney Hooper testified that he made a deliberate decision to have Rodgers wear jail clothing, rather than street clothes, during the penalty phase. Hooper explained that — given that the jury will be asked to decide between the sentences of death and life in prison without parole — he thinks it is important to argue to the jury that life in prison without parole is not a significantly more lenient sentence than death. Hooper testified that the defendant’s appearance in jail clothes better supports Hooper’s tactic of making life in prison sound “as horrible as possible” because the clothing helps demonstrate to the jury that once the defendant is in prison, “he’s gonna spend the rest of his life in a small, little cage and ... he won’t be able to make one damn decision for himself, including what to wear.” The trial record confirms that Hooper argued to the jury that life in prison without parole is a harsh sentence that would sufficiently punish Rodgers and that Hooper gestured to Rodgers’ jail jumpsuit for emphasis during that argument.
This strategic decision was within the broad range of professional conduct. As recognized by the United States Supreme Court in Estelle, v. Williams, 425 U.S. 501, 507-08, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the right at issue, if it applies to the penalty phase, is a right to be free of compulsion to wear jail garb — not a right to wear street clothes during trial — and that the defense at times may prefer that the defendant wear jail clothing:
The reason for this judicial focus upon compulsion is simple; instances frequently arise where a defendant prefers to stand trial before his peers in prison garments. The cases show, for example, that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury.
In the instant case, the jury convicted Rodgers of first-degree murder during the guilt phase. Thus, during the penalty phase, counsel could have reasonably concluded that the potential benefit of arguing to the jury that life in prison is a harsh sentence outweighed any potential harm from emphasizing the defendant’s guilt.
III. CONCLUSION
For the reasons stated above, we affirm the circuit court’s denial of Rodgers’ motion for postconviction relief.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.